[No. B236764. Second Dist., Div. Four. Jan. 25, 2013.]

MOURIS AHDOUT, Plaintiff and Appellant, v.
MAJID HEKMATJAH et al., Defendants and Respondents.

22

## Counsel

Etehad Law Firm, Simon P. Etehad, Rabin Saidian; Benedon & Serlin, Douglas G. Benedon and Gerald M. Serlin for Plaintiff and Appellant.

Law Offices of Rosenthal & Associates and Lisa F. Rosenthal for Defendants and Respondents.

OPINION

WILLHITE, J.—

## INTRODUCTION

Appellant Mouris Ahdout appeals from a judgment entered following the superior court's denial of his petition to vacate an arbitration award and its grant of a petition to confirm the award filed by respondents Majid Hekmatjah, also known as Michael Braum (Braum), Hekmatjah Family Limited Partnership (Hekmatjah), and Braum Investment & Development, Inc. (BIDI). Ahdout and respondent Hekmatjah were the sole members of 9315 Alcott, LLC (the Company), a limited liability company they formed for the purpose of developing a condominium project, with respondent Braum designated as manager of the Company.

Disputes between the parties were submitted to binding arbitration. Ahdout argued that BIDI, the general contractor owned by Braum that was hired to construct the project, was not licensed and thus was required to disgorge all compensation for its contracting services pursuant to Business and Professions Code section 7031, subdivision (b).[1] The arbitrators' denial of Ahdout's claims based on section 7031 underlies Ahdout's petition to vacate the award.

The trial court concluded that the arbitrators' decision was not reviewable, and thus denied the petition to vacate the award. We find that Ahdout's claims under section 7031 fall within the "public policy" exception to the general prohibition of judicial review of arbitration awards, because section 7031 constitutes a clear-cut and explicit legislative expression of public policy mandating the disgorgement of compensation received by an unlicensed contractor. Thus, the trial court erred in deferring to the arbitrators' finding that section 7031 does not apply. We remand the matter to the trial court to conduct a de novo review.

## BACKGROUND

*The Operating Agreement for the Company*

Ahdout and Hekmatjah owned adjoining parcels of real property, at 9311 and 9315 Alcott Avenue, respectively. In 2002, Ahdout and Hekmatjah formed the Company, the purpose of which was to acquire both parcels (the Property) and to build a 14-unit condominium project there (the Project).

---

[1] All subsequent undesignated statutory references herein are to the Business and Professions Code.

Ahdout and Hekmatjah were the sole members of the Company. They entered into an operating agreement for the Company (the Agreement) that included the following terms, among others:

For initial capital, Ahdout was to contribute the property at 9311 Alcott and Hekmatjah was to contribute the property at 9315 Alcott. A capital account for each member was credited with $565,000, based on the fair market value of each property.

Profits resulting from the Project were to be allocated in accordance with the profit and loss sharing percentages of each member. Section 3.10 of the Agreement provides for the profit and loss-sharing percentages of each members to be determined as follows: "After the Project has been completed the costs of construction (both hard and soft costs) shall be determined and HEKMATJAH shall be credited with an amount equal to 25% thereof and AHDOUT and HEKMATJAH shall each be credited with an amount equal to 50% of said construction costs. The total amount credited to both AHDOUT and HEKMATJAH shall be determined and the percentage of profits and losses of each of AHDOUT and HEKMATJAH shall be the percentage that the total amount credited to each Member bears to the total amount credited to both Members." The Agreement provides an example, assuming that the total costs of construction were $3 million:

"HEKMATJAH
"$ 565,000 capital contribution
 750,000 25% of construction costs
 1,500,000 50% of construction costs
"$ 2,815,000

"AHDOUT
"$ 565,000 capital construction
 1,500,000 50% of construction costs
"$ 2,065,000

"$2,065,000 + $2,815,000 = $4,880,000

"Percentage of profits and losses of HEKMATJAH

"$2,815,000 divided by $4,880,000 = 57.7%

"Percentage of profits and losses of AHDOUT

"$2,065,000 divided by $4,880,000 = 42.3%"

Braum, who was the general partner of Hekmatjah, was appointed the manager of the Company, and as such was empowered to direct, manage and control the business and affairs of the Company. He was not to receive compensation for his services as manager.

The Agreement further provides in section 4.1(D) that "[t]he Manager shall enter into an agreement with [BIDI] (the 'Contractor'), a general contractor, to construct the Project and in this regard shall have the power and authority to execute any and all contracts and/or purchase orders with appropriate firms, persons or entities to obtain all services and materials required in order to carry out the development, construction and sale of the Project. The Contractor shall construct the Project without payment of any consideration it being understood and agreed that Contractor is owned by the general partner of HEKMATJAH [(i.e., Braum)] and that HEKMATJAH will benefit by Contractor constructing the Project on a 'no fee' basis by receiving an adjustment to its profits and losses as determined by Section 3.10." Thus, section 3.10 provides for Hekmatjah to be credited with an additional 25 percent of the construction costs for purposes of the profit-sharing formula to compensate for BIDI's contracting services.

Following the execution of the Agreement, titles to the parcels of property presumably were transferred to the Company pursuant to the Agreement, although the record does not reflect evidence of such transfer. The record also does not contain any evidence that the Company entered into a written construction contract with BIDI. However, the record contains evidence that BIDI indeed performed certain construction tasks for the Project and engaged numerous subcontractors for various aspects of the Project.

*Dispute Between Ahdout and Respondents*

Construction on the Project "suffered numerous setbacks, including the death of [the] architect, plan revisions mandated by the City of Los Angeles Department of Building and Safety, and construction delays." Construction was finally completed almost six years after the Company was formed, and the certificate of occupancy was received on January 29, 2008. Although the condominiums had been intended for sale, the Company, under Braum's management, decided to wait to sell them and instead to rent them until the real estate market rebounded. Ahdout was unhappy with the construction delays and cost overruns as well as alleged mismanagement and misuse of Company funds by Braum. He also had expected high-end, luxury condominiums to be built instead of what he claimed were economy-grade units. Under the Agreement, the parties were bound to arbitrate disputes arising thereunder, and Ahdout and respondents entered into two agreements to submit Ahdout's claims to binding arbitration before the Rabbinical Council of California.

*Arbitration Proceedings*

The arbitration was conducted over 27 days within an 11-month period. Ahdout made 24 separate claims before the arbitrators. Only the first and

sixth claims concerning the application of section 7031 are at issue on this appeal.[2] Invoking section 7031's disgorgement remedy, the first claim sought alteration of the formula for sharing profits and losses whereby Hekmatjah was credited an additional 25 percent of the costs of construction as a form of compensation for BIDI's construction work on the Project. Instead, Ahdout sought to have Ahdout and Hekmatjah each be credited 50 percent of the costs. The sixth claim sought disgorgement of the total construction costs of $4,085,484.40, to be paid to the Company, half of which ($2,042,742.20) Ahdout alleged should either be paid in cash to him or credited to his capital account, pursuant to the adjusted 50/50 split for which he argued in the first claim.

Little of the evidence before the arbitrators appears in the record on appeal. The record contains a PowerPoint presentation that Ahdout's counsel attests was submitted to the arbitrators and read from by Braum during his testimony before the panel. It provides, in part: "Braum acted as a General Contractor, and NEVER claimed himself as a Licensed General Contractor (Ahdout was well aware of this). [¶] The partnership could have hired a licensed general contractor and charged [the Company] a substantial fee. [¶] Braum instead, hired 24 licensed sub-contractors and 11 architects/engineers/inspectors who have the requisite skills and knowledge of the applicable local laws and codes and charged the [Company] a very reasonable fee."

Braum further testified that "Ahdout agreed that Braum's fees as a developer would be 25% of the total construction (hard cost and soft cost)." He stated that "Braum understands the California State Law that whoever builds a commercial building must be B licensed.[3] . . . City of LA is not governed by that law. For the building part (demolishing, excavating, footing, concrete work, finish carpentry, floor installation, etc.) they ACCEPT THE MANAGER OF THE [COMPANY] as the owner of the project and will be issued the permit. [¶] City of LA accepted Braum 'Manager' of 9315 Alcott as the owner of the project; was issued the permit and recognized as an Owner/builder."

Documents submitted by respondents to the arbitrators further assert that BIDI hired numerous contractors for various construction tasks at the Project,

---

[2] Ahdout's remaining claims concerned the division of loan proceeds, liability for construction loan interest and costs, alleged misappropriation and embezzlement of Company funds by Braum, distribution of rental income, alleged breach of promises to build high-end condominiums, as well as alleged overcharging and mismanagement of construction costs by Braum. Ahdout also sought the removal of Braum as manager of the Company. Lastly, he sought attorney fees incurred in the arbitration.

[3] A general building contractor is classified as a class B contractor. (Cal. Code Regs., tit. 16, § 830, subd. (a).)

but that BIDI itself "[i]nstalled drywall, doors, and water proofing, concrete work, footing and concrete deck."

The arbitrators issued a judgment denying Ahdout's first claim seeking to reverse the extra economic interest awarded to Hekmatjah as compensation for BIDI's construction costs, and instead made minor adjustments to the profit-sharing percentages. They also denied the sixth claim, finding that "[b]ased upon the evidence and the law," respondents were not required to disgorge the cost of construction. The arbitrators later issued a supplemental judgment further elaborating as follows: "While the LLC agreement describes that [BIDI] was to be engaged as a general contractor, the Bais Din finds that in fact the Respondent functioned as the manager of the LLC and as a consultant to the LLC and neither Respondent nor [BIDI] engaged in any work typically done by general contractors. The contracting work was done by contractors that entered into direct agreement with the LLC, virtually all of whom were licensed contractors."

*Superior Court Proceedings*

Ahdout brought a petition in superior court to vacate the arbitration award on the ground that the arbitrators exceeded their authority by allowing respondents to keep compensation they received for contracting work on the Project despite being unlicensed. Respondents petitioned to confirm the award.

Ahdout submitted evidence that BIDI had a C-15 flooring and floor covering license[4] (license No. 669297) during the construction period, not a class B general contractor's license, and that BIDI was not granted a general contractor's license until September 16, 2009, well after the completion of construction. He submitted the PowerPoint presentation that Braum submitted to the arbitrators describing BIDI's role in the construction, described above. He also attached the bank loan application for the Project in which Braum declared under penalty of perjury that "Braum Construction," with license No. 669297, was the contractor for the Project, as well as a County of Los Angeles request for new construction information in which Braum again declared under penalty of perjury that Braum Construction was the contractor. Ahdout also submitted nine preliminary 20-day notices of intention to place liens for unpaid subcontracting work on the Project, all of which listed BIDI as the contractor, as well as invoices for various materials for the Project

---

[4] "A flooring and floor covering contractor prepares any surface for the installation of flooring and floor coverings, and installs carpet, resilient sheet goods, resilient tile, wood floors and flooring (including the finishing and repairing thereof), and any other materials established as flooring and floor covering material, except ceramic tile." (Cal. Code Regs., tit. 16, § 832.15.)

submitted to BIDI and several checks paid by BIDI to purported subcontractors for work on the Project.

For their part, respondents argued that section 7031 was inapplicable because they had not been paid any compensation for the construction services. Although the Agreement specified that profits would be reallocated based on final construction cost figures, respondents asserted that "[n]o amount [of Hekmatjah's share of the profits] is attributable to any contribution by BIDI for its services to the Company." In addition, they contended that Ahdout did not have standing under section 7031 because he did not hire or utilize the services of BIDI, and only a "person who utilizes the services of an unlicensed contractor" may sue to recover compensation paid to the contractor. Braum asserted in a declaration that "[a]ll of the costs of construction of the Project were paid by the Company." Finally, respondents argued the arbitrators correctly found that, despite the provision of the Agreement specifying that BIDI would act as the general contractor, in fact BIDI did not provide any services for which a license was required under the Contractors' State License Law. (§ 7000 et seq.; CSLL.)

In reply, Ahdout submitted evidence that 25 percent of the construction costs translated to $1,049,140.90, and that this amount was credited to Hekmatjah, thereby increasing his share of the profits under the profit-sharing formula. Ahdout also argued that he made direct payments to cover construction costs for the Project. His attorney declared that Ahdout had paid a total of $929,889.61 either to BIDI or to Braum for unlicensed contractor work on the Project. As an exemplar, he attached a copy of a check from his account in the amount of $150,000 made out to "9315 Alcott Construction."

The trial court denied the motion to vacate the award and granted the petition to confirm it because it concluded it did not have the power to review the arbitrators' decision for errors of fact or law. It found that the only possible exception permitting judicial review was dependent on the Agreement being an illegal construction contract, but it concluded the Agreement was an operating agreement for the Company, not a construction contract. The court concluded that Ahdout "submitted the issue of the illegality of the contract to the arbitrators and they rejected his argument. This court may not second guess that decision."[5]

---

[5] At oral argument, counsel for respondents asserted that the trial court undertook a de novo review and made a finding of fact. However, the trial court limited its scope of review to the issue of whether the Agreement was a construction contract. Concluding that it was not a construction contract and therefore the court did not have the power to review the arbitrators' decision, the trial court's analysis went no further. Thus, the trial court did not conduct a de novo review of whether the arbitrators correctly determined that section 7031 did not apply.

Ahdout filed a notice of appeal from the order denying his petition to vacate and the order confirming the award. However, neither an order denying a petition to vacate the award under Code of Civil Procedure section 1286.2 nor an order confirming an award is directly appealable. (Code Civ. Proc., § 1294; *Mid-Wilshire Associates v. O'Leary* (1992) 7 Cal.App.4th 1450, 1454 [9 Cal.Rptr.2d 862].) Review of an order denying a petition to vacate may only be had upon appeal from the *judgment of confirmation* or by writ of mandate. (*Mid-Wilshire Associates v. O'Leary, supra,* 7 Cal.App.4th at p. 1455.) The appellate record does not contain a judgment confirming the award. However, we have taken judicial notice of such a judgment entered in the case after the notice of appeal was filed, and we exercise our discretion to treat the notice of appeal as applying to that judgment.

## DISCUSSION

The Agreement provided that the Company "shall enter into an agreement with [BIDI] (the 'Contractor'), a general contractor, to construct the Project." Because BIDI was not licensed for general contractor work, and yet Ahdout asserts it performed such work on the project, Ahdout contends the arbitrators exceeded their powers by failing to order respondents to disgorge the construction costs pursuant to section 7031, subdivision (b), and by failing to adjust the profit-sharing arrangement, which partially depended on the allocation of construction costs.

I. *Prohibition on Unlicensed Construction Work Under the CSLL*

We begin by summarizing the relevant provisions of the CSLL (§ 7000 et seq.), which provides the basis for Ahdout's claim.

■ "To protect the public, the [CSLL] imposes strict and harsh penalties for a contractor's failure to maintain proper licensure." (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 418 [30 Cal.Rptr.3d 755, 115 P.3d 41], fn. omitted (*MW Erectors*).) Section 7031, subdivision (a) shields parties who utilize the services of an unlicensed contractor from lawsuits by that contractor seeking to collect payment for unlicensed work. (§ 7031, subd. (a); *MW Erectors, supra,* 36 Cal.4th at p. 418.) Further, subdivision (b) of section 7031 provides that parties who hire an unlicensed contractor are entitled to reimbursement for compensation received by such a contractor even if they knew the contractor was unlicensed.[6] (§ 7031, subd. (b); *Alatriste v. Cesar's Exterior Designs, Inc.* (2010)

---

[6] Section 7031, subdivision (b) provides: "Except as provided in subdivision (e) [(which is not relevant here)], a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract."

183 Cal.App.4th 656, 668 [108 Cal.Rptr.3d 277].) Under this latter subdivision, "contractors are required to return all compensation received without reductions or offsets for the value of material or services provided." (*White v. Cridlebaugh* (2009) 178 Cal.App.4th 506, 520–521 [100 Cal.Rptr.3d 434].) "The burden to prove licensure rests with the party asserting a contractor is licensed." (*Oceguera v. Cohen* (2009) 172 Cal.App.4th 783, 790 [91 Cal.Rptr.3d 443]; see § 7031, subd. (d) ["When licensure or proper licensure is controverted, the burden of proof to establish licensure or proper licensure shall be on the licensee."].)

 " '[C]ourts may not resort to equitable considerations in defiance of section 7031.' [Citation.] That is because the statute ' " 'represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business *outweighs any harshness between the parties . . . .* ' " [Citation.]' [Citation.]" (*WSS Industrial Construction, Inc. v. Great West Contractors, Inc.* (2008) 162 Cal.App.4th 581, 587 [76 Cal.Rptr.3d 8] (*WSS*).)

The term "contractor" is defined to include "any person who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or herself or by or through others, construct . . . any building . . . , project, development or improvement, or to do any part thereof." (§ 7026.) A licensee classified as a class C specialty contractor "shall not act in the capacity of a contractor in any classification other than one in which he/she is classified except on work incidental or supplemental to the performance of a contract in a classification in which any contractor is licensed by the Board." (Cal. Code Regs., tit. 16, § 834, subd. (c); see Cal. Code Regs., tit. 16, § 830, subd. (b) ["Contractors licensed in one classification shall be prohibited from contracting in the field of any other classification unless they are also licensed in that classification or are permitted to do so by Section 831 [(which covers incidental and supplemental work)].")

"[B]oth the person who provides construction services himself and one who does so 'through others' qualifies as a 'contractor.' The California courts have also long held that those who enter into construction contracts must be licensed, even when they themselves do not do the actual work under the contract. [Citations.] Indeed, if this were not the rule, the requirement that general contractors be licensed would be completely superfluous." (*Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 941 [29 Cal.Rptr.2d 669]; see *id.* at p. 940 ["even if [development company] performed only administrative and oversight functions with respect to the actual installation of infrastructure improvements, it nevertheless acted 'in the capacity of' a general engineering contractor . . ."]; cf. *The Fifth Day, LLC v.*

*Bolotin* (2009) 172 Cal.App.4th 939, 948 [91 Cal.Rptr.3d 633] [construction management company did not function as a contractor where there was no evidence company had "responsibility or authority to perform any construction work on the project, or to enter into any contract or subcontract," and instead it merely assisted property owner in coordinating the activities of construction workers to enable them to complete their assigned tasks on time and on budget, and acted as owner's agent by maintaining records and keeping the owner informed on the status of the project].) "The reason contractors must be licensed even if they hire subcontractors to do the actual work is so that the public is protected ' "against persons who are unqualified to perform the required work." ' [Citation.]" (*WSS, supra,* 162 Cal.App.4th at p. 593.)

Further, "[s]ection 7031 applies not only to formal agreements, but governs 'any *act* or contract for which a license is required.' . . . [Citation.] The statute applies whether or not a party is operating under an executed contract when performing tasks that require licensure." (*WSS, supra,* 162 Cal.App.4th at p. 592.) "[O]ne may not avoid the all-or-nothing bar against recovery for unlicensed services simply because there is no formal contract." (*MW Erectors, supra,* 36 Cal.4th at p. 428.)

■ Given the protective purpose of the CSLL, the Legislature did not intend the term "compensation" as used in the statute to be narrowly construed; rather, it "should be read in its usual and ordinary sense, which imports payment or reward in any form." (*Johnson v. Mattox* (1968) 257 Cal.App.2d 714, 718 [65 Cal.Rptr. 185].) Thus, " '[t]he term "compensation" as used in the statute "denotes sums claimed as an agreed price, fee or percentage earned by performance, and also sums claimed as the reasonable value of work done under implied contract." [Citation.]' [Citation.]" (*UDC-Universal Development, L.P. v. CH2M Hill* (2010) 181 Cal.App.4th 10, 26 [103 Cal.Rptr.3d 684]; see *K & K Services, Inc. v. City of Irwindale* (1996) 47 Cal.App.4th 818, 823–824 [54 Cal.Rptr.2d 836] [where unlicensed contractor was to receive exclusive renewable permit for fill rights for a quarry in return for construction work, fill rights were plainly "compensation" within the meaning of § 7031; fact that agreement did not call for payment of money to contractor did not render § 7031 inapplicable].)

## II. *Finality of Arbitrators' Award*

The question before us is whether the trial court properly deferred to the arbitrators' determination that respondents did not perform unlicensed contracting work on the Project, such that section 7031, subdivision (b) is inapplicable.

The scope of judicial review of arbitration awards is extremely narrow because of the strong public policy in favor of arbitration and according finality to arbitration awards. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 32 [10 Cal.Rptr.2d 183, 832 P.2d 899] (*Moncharsh*); *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.* (2010) 187 Cal.App.4th 1405, 1416 [114 Cal.Rptr.3d 781] (*Cotchett*).) An arbitrator's decision generally is not reviewable for errors of fact or law. (*Moncharsh, supra*, 3 Cal.4th at p. 6; *City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 333 [91 Cal.Rptr.2d 500] (*Palo Alto*).) However, Code of Civil Procedure section 1286.2 provides limited exceptions to this general rule, including an exception where "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc., § 1286.2, subd. (a)(4); see *Palo Alto, supra*, 77 Cal.App.4th at pp. 333–334.) "[W]hether the arbitrator exceeded his or her powers . . . , and thus whether the award should have been vacated on that basis, is reviewed on appeal de novo." (*Richey v. AutoNation, Inc.* (2012) 210 Cal.App.4th 1516, 1526 [149 Cal.Rptr.3d 280] (*Richey*).)

## A. *Exception for Award Enforcing Illegal Contract*

One of the ways an arbitrator exceeds its powers is by enforcing an illegal contract. (*Moncharsh, supra*, 3 Cal.4th at p. 31.) Ahdout contends that the Agreement was illegal because its core provisions concern the development of the Property, with the Project to be constructed by BIDI, an unlicensed contractor.

Ahdout chiefly relies on two cases which he maintains are controlling, *Loving & Evans v. Blick* (1949) 33 Cal.2d 603 [204 P.2d 23] (*Loving*) and *Lindenstadt v. Staff Builders, Inc.* (1997) 55 Cal.App.4th 882 [64 Cal.Rptr.2d 484] (*Lindenstadt*). In *Loving*, the Supreme Court considered a claim that an arbitration award violated section 7031 by allowing unlicensed contractors to recover compensation for construction work. The contractors had entered into a written building contract with the homeowner for the repair and remodeling of a home. (*Loving, supra*, 33 Cal.2d at p. 604.) When the homeowner refused to pay the full amount due, the parties agreed to submit their dispute to arbitration. (*Ibid.*) During the arbitration the homeowner relied on the defense that the contractors could not recover on the building contract because they were not licensed. (*Id.* at pp. 604–605.) However, the arbitrator found in favor of the contractors and awarded them the amount due under the contract. (*Id.* at p. 605.) The trial court confirmed the award. (*Id.* at p. 606.)

The California Supreme Court reversed the judgment. Finding that the undisputed evidence demonstrated that the contractors were unlicensed, the

court found that the entire transaction between them and the homeowner was " 'illegal and void,' for completion of the contract 'necessarily would involve the performance of illegal acts.' " (*Loving, supra*, 33 Cal.2d at p. 609.) Further, " 'a claim arising out of an illegal transaction is not a proper subject matter for submission to arbitration, and . . . an award springing out of an illegal contract, which no court can enforce, cannot stand on any higher ground than the contract itself.' " (*Id.* at p. 610.) The court held that "when a party seeks to use the processes of the courts to obtain confirmation of an arbitrator's award, and an issue is raised concerning the alleged illegality of the contract upon which the award is based, the trial court is the tribunal which must determine such issue of illegality upon the evidence presented to it. . . . A party seeking confirmation cannot be permitted to rely upon the arbitrator's conclusion of legality for the reason that paramount considerations of public policy require that this vital issue be committed to the court's determination whenever judicial aid is sought." (*Id.* at p. 614.) Because the construction contract was illegal and void due to the contractors' lack of a license for a portion of the construction period, the court found that the trial court erred in confirming the arbitration award in the contractors' favor. The case was remanded to the trial court to consider any evidence that the contractors substantially complied with the licensing requirements. (*Id.* at pp. 614–615.)

*Lindenstadt* applied the principles set forth in *Loving* in a case challenging an arbitrator's decision that the defendant owed finder's fees to the plaintiff for his assistance in the defendant's acquisition of certain businesses. The parties had entered into an agreement providing for the payment of such finder's fees in the event of acquisition of particular businesses by the defendant. (*Lindenstadt, supra*, 55 Cal.App.4th at pp. 885–886.) During the arbitration, the defendant asserted that the plaintiff had functioned as an unlicensed real estate broker and thus was statutorily barred from seeking any compensation under the Real Estate Law (§ 10000 et seq.). (*Lindenstadt, supra*, 55 Cal.App.4th at p. 886.) The arbitrator found that the plaintiff had acted as an unlicensed broker with respect to two businesses acquired by the defendant, but had not acted as a broker with respect to two others. (*Id.* at pp. 886–887.) The plaintiff filed a petition in the trial court to confirm the award, which the defendant opposed, arguing that the trial court was obligated to undertake a de novo review of the evidence to determine whether the award was based on illegal contracts or transactions. (*Id.* at p. 888.) The trial court concluded that it would not undertake such a review because the parties had already litigated the issue in arbitration. (*Ibid.*)

The Court of Appeal reversed and remanded the case to the trial court so that it could independently decide whether the Real Estate Law barred compensation to the plaintiff. (*Lindenstadt, supra*, 55 Cal.App.4th at p. 893.) The court held that it did not matter that the arbitrator had decided that issue,

because " 'any preliminary determination of legality by the arbitrator . . . [is] not . . . binding upon the trial court' [citation]." (*Id.* at p. 892.) Rather, the trial court must conduct a de novo review of the claim of illegality, considering all admissible evidence submitted to the court, whether or not that evidence had been submitted to the arbitrator. (*Ibid.* & fn. 8.) "If [the plaintiff] acted as an unlicensed real estate broker on a transaction, the arbitrator exceeded her powers (Code Civ. Proc., § 1286.2, subd. (d)) to the extent she awarded compensation for that work." (*Id.* at p. 893.)

Ahdout essentially contends that *Loving* and *Lindenstadt* mandate judicial review of the arbitration award denying his disgorgement claim under section 7031, because they stand for the propositions that arbitrators exceed their powers when they enforce illegal contractual provisions and that arbitrators' findings regarding the claimed illegality are not binding on the court that hears a petition to vacate the award. However, in *Moncharsh*, the Supreme Court limited its holding in *Loving*, and its analysis is equally applicable to confine the reach of *Lindenstadt*.

*Moncharsh* concerned a challenge to an arbitration award that enforced a provision in an attorney's employment agreement stating that if the attorney left his law firm and clients went with him, the attorney would owe the law firm 80 percent of any fees generated from work for these clients. (*Moncharsh, supra*, 3 Cal.4th at p. 6.) After the attorney left and took some clients with him, the law firm invoked this provision and sought a percentage of the fees paid to the attorney. During the arbitration, the attorney argued that the provision was illegal because it violated certain Rules of Professional Conduct of the State Bar. (3 Cal.4th at pp. 7, 32–33.) The arbitrator found that the fee provision did not contravene these rules and ruled in the law firm's favor. (*Id.* at p. 7.)

The attorney petitioned the superior court to vacate the arbitration award, but the superior court found that the arbitrator's findings were conclusive, and the Court of Appeal agreed. On review, the Supreme Court, after reaffirming "the general rule that, with narrow exceptions, an arbitrator's decision cannot be reviewed for errors of fact or law" (*Moncharsh, supra*, 3 Cal.4th at p. 11), considered the attorney's argument that *Loving* required that the arbitration award be vacated because it was based on an illegal contractual provision (*id.* at p. 29).

The court concluded that *Loving* "permitted judicial review of an arbitrator's ruling where a party claimed the *entire contract or transaction was illegal.*" (*Moncharsh, supra*, 3 Cal.4th at p. 32, italics added; see *id.* at p. 31 [" '[T]he rules which give finality to the arbitrator's determination of ordinary questions of fact or of law are inapplicable *where the issue of*

*illegality of the entire transaction* is raised in a proceeding for the enforcement of the arbitrator's award.' [Citation.]"].) Whereas the building contract in *Loving* was rendered void in its entirety by the contractor's lack of a license, the illegality alleged in *Moncharsh* affected only one provision of an employment contract "containing a number of provisions governing various aspects" of the employment of an attorney by his law firm. (*Moncharsh, supra,* 3 Cal.4th at p. 6.) The court held that "when—as here—the alleged illegality goes to only a portion of the contract (that does not include the arbitration agreement), the entire controversy, including the issue of illegality, remains arbitrable." (*Moncharsh, supra,* at p. 30; see *Wolitarsky v. Blue Cross of California* (1997) 53 Cal.App.4th 338, 344 [61 Cal.Rptr.2d 629].) Thus, the court affirmed the lower courts' decision deferring to the arbitrator.[7]

Similarly, in *Lindenstadt,* the agreement solely concerned the plaintiff's entitlement to finder's fees in the event that the defendant acquired businesses that the plaintiff had helped to find. (*Lindenstadt, supra,* 55 Cal.App.4th at pp. 885–886.) Indeed, the court in *Lindenstadt* noted the language in *Moncharsh* limiting the scope of *Loving* to cases where the entire contract or transaction was illegal. (*Lindenstadt, supra,* 55 Cal.App.4th at p. 892.)

As in *Moncharsh,* and in contrast to *Loving* and *Lindenstadt,* the alleged illegality in the instant case does not infect the entire contract. The unlicensed status of BIDI is pertinent only with respect to the provision obligating the Company to enter into a separate agreement with BIDI to act as the general contractor in the construction of the Project, and to the provision providing for an adjustment to the members' respective profits and losses based on BIDI's contribution of construction. Although Ahdout is correct that the overall purpose of the Company was to develop the Property and construct condominiums there, the Agreement was not a construction contract between the Company and BIDI as was the contract at issue in *Loving.* The Agreement has a broad scope, including provisions that set forth the structure of the Company, the capitalization requirements, the rules for distribution and management, members' rights and interests, the procedure for the eventual dissolution and liquidation of the Company, the requirement to arbitrate disputes, as well as numerous housekeeping provisions. Therefore, the exception enunciated in *Loving* and *Lindenstadt,* as considered by *Moncharsh,* is not applicable.

### B. *Public Policy Exception*

Our holding that *Loving* does not mandate judicial review of the arbitration award in this case does not end the inquiry. *Moncharsh* recognized that "there

---

[7] However, the court discussed other exceptions to the general prohibition on judicial review of arbitration awards, one of which is discussed further below.

may be some limited and exceptional circumstances justifying judicial review of an arbitrator's decision when a party claims illegality affects only a portion of the underlying contract. Such cases would include those in which granting finality to an arbitrator's decision would be inconsistent with the protection of a party's statutory rights. [Citation.] [¶] Without an explicit legislative expression of public policy, however, courts should be reluctant to invalidate an arbitrator's award on this ground. The reason is clear: the Legislature has already expressed its strong support for private arbitration and the finality of arbitral awards . . . . Absent a clear expression of illegality or public policy undermining this strong presumption in favor of private arbitration, an arbitral award should ordinarily stand immune from judicial scrutiny." (*Moncharsh, supra,* 3 Cal.4th at p. 32.)

Numerous courts have since construed *Moncharsh* to stand for the proposition that an arbitrator exceeds its powers within the meaning of Code of Civil Procedure section 1286.2 by issuing an award that violates a party's statutory rights or "an explicit legislative expression of public policy." (*Cotchett, supra,* 187 Cal.App.4th at p. 1416; see *Richey, supra,* 210 Cal.App.4th at p. 1525 ["an arbitrator exceeds his or her power within the meaning of Code of Civil Procedure section 1286.2 and the award is properly vacated when it violates an explicit legislative expression of public policy"]; *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 438 [123 Cal.Rptr.2d 122] (*Jordan*) [applying the "limited and exceptional circumstance justifying judicial review of an award that violates an explicit expression of public policy"]; *Palo Alto, supra,* 77 Cal.App.4th at p. 334 ["The normal rule of limited judicial review cannot be avoided except in those rare cases where 'according finality to the arbitrator's decision would be incompatible with the protection of a statutory right' or where the award contravenes 'an explicit legislative expression of public policy.' [Citations.]"].)

Therefore, "courts may, indeed must, vacate an arbitrator's award when it violates a party's statutory rights or otherwise violates a well-defined public policy." (*Department of Personnel Administration v. California Correctional Peace Officers Assn.* (2007) 152 Cal.App.4th 1193, 1200, 1203 [62 Cal.Rptr.3d 110] [arbitrator's award properly vacated where it reformed a memorandum of understanding already approved by the Legislature, in violation of the Ralph C. Dills Act (Gov. Code, § 3512 et seq.) and thus in contravention of the "public policy of legislative oversight of employee contracts"].) Applying this public policy exception, the appellate court in *Jordan* granted the state's petition to vacate an arbitration award of $88 million against California's Department of Motor Vehicles, based on the unconstitutional implementation of the smog impact fee on out-of-state vehicles registering in California. The state's maximum fee exposure had been determined to be $18 million. Because the award constituted a gift of

public funds prohibited by article XVI, section 6 of the California Constitution, the court found that the $88 million arbitration award violated a clear expression of public policy and thus exceeded the arbitrator's powers. (*Jordan, supra,* 100 Cal.App.4th at p. 453; see *Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert* (2011) 194 Cal.App.4th 519, 534 [125 Cal.Rptr.3d 83] [by inserting language in a letter of retraction that "impermissibly infringes on Schneickert's constitutional right of free speech, the arbitrator exceeded his authority"]; *Palo Alto, supra,* 77 Cal.App.4th at pp. 338–340 [arbitration award reinstating an employee who had threatened another employee, and who had been enjoined by court order from going to the workplace, was irreconcilable with the public policy requiring obedience to court orders].)

This exception is applicable only when there has been " 'a clear expression of illegality or public policy' " that undermines the presumption in favor of private arbitration. (*Cotchett, supra,* 187 Cal.App.4th at p. 1417; see, e.g., *City of Richmond v. Service Employees Internat. Union, Local 1021* (2010) 189 Cal.App.4th 663, 672 [118 Cal.Rptr.3d 315] [judicial review not permissible of arbitrator's award ordering reinstatement of employee based on public policy exception, because although there is a strong public policy against sexual harassment in the workplace, "[t]here is no absolute public policy against reinstatement of persons who have engaged in sexual harassment . . ."].)

██ We conclude that section 7031 constitutes an "explicit legislative expression of public policy," that if not enforced by an arbitrator, constitutes grounds for judicial review. "The purpose of the [CSLL] licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services. [Citation.] The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business. [Citations.] [¶] Section 7031 advances this purpose by withholding judicial aid from those who seek compensation for unlicensed contract work. The obvious statutory intent is to discourage persons who have failed to comply with the licensing law from offering or providing their unlicensed services for pay." (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995 [277 Cal.Rptr. 517, 803 P.2d 370].) Similarly, the more recently enacted subdivision (b) of section 7031 furthers this aim by requiring disgorgement of compensation already paid to unlicensed contractors by persons utilizing their services.

Because section 7031 constitutes an explicit legislative expression of public policy regarding unlicensed contractors, the general prohibition of judicial review of arbitration awards does not apply. The fact that section 7031

reflects an explicit expression by the *Legislature* of its public policy objectives sets this case apart from *Moncharsh*, which concerned alleged violations of the Rules of Professional Conduct that are approved by the Supreme Court, not the Legislature. (See *Moncharsh, supra*, 3 Cal.4th at p. 33; *Cotchett, supra*, 187 Cal.App.4th at pp. 1417–1418.) In *Cotchett*, which similarly concerned an arbitration award that rested on an alleged violation of the Rules of Professional Conduct prohibiting unconscionable fee arrangements, the court found that although fee agreements that violate these rules may be deemed unenforceable on public policy grounds, "it does not necessarily follow that public policy requires the court, rather than an arbitrator, to finally determine whether a fee is unconscionable" under those rules. (*Cotchett*, at p. 1418.) By contrast, where a public policy is articulated explicitly by the Legislature, as with section 7031, courts are vested with the final word on whether the provision applies. Furthermore, whereas the court in *Moncharsh* "perceive[d] . . . nothing in the Rules of Professional Conduct at issue in this case that suggests resolution by an arbitrator of what is essentially an ordinary fee dispute would be inappropriate or would improperly protect the public interest" (*Moncharsh, supra*, 3 Cal.4th at p. 33), the CSLL provisions are intended to protect the general public in part from the hazards of shoddy construction work, and thus judicial review of arbitration awards that allegedly fail to enforce section 7031 is appropriate.

Thus, in the instant case, the trial court should have conducted a de novo review of the evidence to determine whether disgorgement of compensation for BIDI's construction work was required by section 7031.[8] The arbitrators' finding that BIDI did not function as a general contractor on the Project is not binding on the trial court. On remand, the court must independently consider this defense to Ahdout's claim along with others raised by respondents in their opposition to the petition to vacate the arbitration award, taking into

---

[8] *Templo Calvario Spanish Assembly of God v. Gardner Construction Corp.* (2011) 198 Cal.App.4th 509 [129 Cal.Rptr.3d 574] (*Templo Calvario*), relied upon by respondents as well as the trial court, does not compel a different result. In that case, the trial court concluded that, under *Loving*, a contractor's lack of a license at the time it executed a construction agreement with a project owner rendered the agreement, including the arbitration provision, illegal or void, and thus the arbitrator did not have authority to arbitrate the project owner's claim under section 7031. (*Templo Calvario, supra*, 198 Cal.App.4th at pp. 515–516.) The Court of Appeal disagreed, finding that in *MW Erectors*, the Supreme Court effectively overruled the holding of *Loving* and thus the arbitrator had authority to arbitrate the dispute. (*Templo Calvario, supra*, 198 Cal.App.4th at p. 520.) The appellate court remanded the case so the trial court could consider the grounds raised in the petition to vacate the arbitration award. (*Id.* at p. 521.) Notably, the court did not conclude that judicial review of the award was unwarranted. Therefore, even if *Templo Calvario* correctly interprets the state of the law, the decision does not affect the outcome here.

account "all of the admissible evidence submitted to it regardless of whether that evidence was before the arbitrator." (*Lindenstadt, supra,* 55 Cal.App.4th at p. 893, fn. 8.)

## DISPOSITION

The judgment is reversed. On remand, the trial court shall conduct a de novo review of the evidence to determine whether section 7031, subdivision (b) is applicable. The parties are to bear their own costs on appeal.

Epstein, P. J., and Suzukawa, J., concurred.