Filed 12/18/23  Kraut v. Quintana CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JONATHAN KRAUT, | B320522 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. EC068294) |
| v. | |
| LEVI QUINTANA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ralph C. Hofer, Judge.  Affirmed.

Levi Quintana, in pro. per., for Defendant and Appellant.

Clark Hill, Richard H. Nakamura, Jr., Pamela A. Palmer, for Plaintiff and Respondent.

Levi Quintana appeals from a judgment confirming an arbitration award in favor of his former business partner, Jonathan Kraut, and their former partnership, Secure Net Protection (SNP). Quintana contends the arbitrator exceeded her authority by improperly classifying his partnership draws as loans and creating a loan and promissory agreement that did not meet legal requirements for a valid written contract. He further argues that the arbitrator ignored the terms of the partnership agreement and the statute of frauds. These contentions fundamentally are challenges to the legal and factual bases for the arbitrator's award, which are not reviewable. We therefore affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     Original Partnership Agreement**

In 2007, Quintana and Kraut formed SNP, a private security and asset protection firm. The parties agreed that Quintana would be responsible for "manpower, client contracts, client accounts, and day-to-day operations," while Kraut would be responsible for "administrative and general business functions . . . beyond the scope of manpower management and customer service." Their partnership agreement "recognized that Quintana is not in a financial position that will offer significant company funding." He thus "pledged his contacts, energies, and time to assist in creating and maintaining" the partnership, while Kraut provided $100,000 in seed money.[1] Kraut also agreed to loan

---

[1]     Kraut also previously loaned Quintana money to purchase a 1999 Ford Explorer, which Quintana largely failed to repay. Under the partnership agreement, Kraut agreed to waive

2

Quintana up to $2,000 per month in "subsistence loans," "as necessary for a period not to exceed four (4) months"; it was "anticipated that Quintana will receive loans directly from [SNP] on or before the fifth (5th) month of [SNP] operations."

The partnership agreement provided that the initial valuation of SNP for purposes of calculating vestment and reimbursement was the $100,000 furnished by Kraut, which was to accrue interest at the rate of 0.5 percent per month. It further provided that Kraut initially would have a 100 percent interest in the partnership, with vestment "expected to reach an equal fifty-fifty balance in time" as Quintana became progressively vested in conjunction with the repayment of Kraut's loans to SNP. Fifty percent of SNP's net profits were to be used to "retire Kraut's debt until all debts and loans to Kraut have been repaid," while Kraut and Quintana were to evenly divide the remaining 50 percent. Kraut agreed to provide Quintana with a monthly statement of loans, expenditures, and interest due to Kraut while any monies remained unpaid. Both parties agreed not to take a fixed salary until SNP earned net income for three consecutive months.

The partnership agreement contained a covenant not to compete. It also contained an arbitration provision, pursuant to which Kraut and Quintana agreed to use binding arbitration "as the first means of resolving any alleged dispute, breach, misconduct, default, or misrepresentation in connection with any of the provisions hereof." They further agreed that any arbitral

penalties and interest, and to "accept Quintana's existing debt in the amount of twelve (12) months at $257.00 which equals $3,084.00, as fair resolution which is to be applied to [SNP] as a loan to Quintana."

3

ruling would be binding, and that "the unsuccessful or non-prevailing party will be responsible for all arbitration and attorneys' fees, court costs, and other costs actually incurred in such action or proceeding, in addition to any other relief to which he may be entitled [*sic*]."

## II.    New Partnership Agreement

Effective January 1, 2016, Kraut and Quintana brought in a third partner to SNP, Aldric Horton.[2]  They prepared a new partnership agreement that by its terms "supersedes all previous Agreements, whether written or oral, between the parties." Under the new agreement, "monies owed, primarily to Kraut, will continue to be repaid through company operations."  The partners agreed to assign a quarterly percentage of SNP's net income "towards debt repayment to Kraut at an amount equal to or greater than 50% of disposable income."  They further agreed that "all loans, funds, expenditures, and credit applied to [SNP] by Kraut shall continue to accrual [*sic*] as a loan from Kraut a straight line interest benefit to Kraut at a rate of ten percent (10%) per year."  Monthly disbursements to the partners were to total $8,000, with Quintana, who worked for SNP full time, to receive $3,758 per month, and Kraut and Horton, who worked part time, to respectively receive $1,636 and $2,606 per month.

The new partnership agreement provided that "regarding issues with more profound than day-to-day and routine operations be considered, [*sic*] all partners must agree to take a new direction or no change in policy will be made at that time." It further included first rights of purchase should any partner wish to divest his ownership, a covenant not to compete for a

---

[2]    Horton was not a party to the underlying arbitration or trial court proceedings and is not a party to this appeal.

4

longer period, and, as most relevant here, an arbitration provision similar to that contained in the original partnership agreement. The updated arbitration provision stated that binding arbitration was to be the "final means of resolving any alleged dispute, breach, misconduct, default, or misrepresentation in connection with any of the provisions hereof," to be used where informal dispute resolution failed. As under the previous arbitration provision, the "unsuccessful or non-prevailing party will be responsible for all arbitration and attorneys' fees, court costs, and other costs actually incurred in such action or proceeding, in addition to any other relief to which he may be entitled [*sic*]."

## III. Memorandum of Understanding

On March 30, 2017, Quintana and SNP signed a three-page memorandum of understanding (MOU).[3] It provided that SNP had been established "entirely based on [Quintana's] commitments" to achieving certain business goals, including generating 2,500 hours per week of business within the first six months and 10,000 hours per week within two years; generating "significant income" from training officers and collecting training fees; minimizing unnecessary expenses and inefficiencies; "[o]perating in a more compassionate and respectful way" than other security firms to attract clients; and generating "significant profits and growth in order to sell the business in 5-7 years." "The reality of the situation," however, was that few of these goals were achieved. SNP "never achieved more than 750 hours

---

[3]     Quintana maintained during the arbitration that he only saw the final page of the MOU, which bears his signature. He claimed he was not presented with the first two pages, which set forth the "financial obligation" described *post*.

per week in business" or more than approximately $100 per year in income from officer training and "lost an average of $100,000 per year" during its first nine years, including Quintana's draw. It also experienced staffing problems, threats of litigation, and other challenges under Quintana's oversight of its day-to-day operations. SNP's fortunes began to turn after Horton was hired as an employee in 2015; it "added over $1,000,000 in revenue" in a single year. Horton "voiced numerous times a need to eliminate the disruptions and instability created by [Quintana's] continued engagement and participation."

In late 2016, SNP hired a new operations manager, Miguel. Quintana "continued to meddle, interfere, withhold, and sabotage the new chain of command with employees, staff, and clients." Pursuant to the MOU, Quintana "agree[d] to make personal adjustments," including "letting go and completely dissociating with day-to-day operations which allows Aldric [Horton] and Miguel to take full responsivity [*sic*] with security clients, staff, and activities" and turning his attention to "the creation and development of new revenue streams, i.e., OSHA inspections, behavioral assessments, and expanded opportunities for service." He also agreed to "eliminate all contact with officers, supervisors, employees, and staff," and "disengage fully from Secure Net activities" except under specified circumstances.

In addition to setting forth the above "realities" and "remedies," the MOU required Quintana to place a portion of his equity in trust "as a means of ensuring these terms are met." It further provided that the equity in trust would be forfeited "[s]hould intentional conduct or activity occur that violates this commitment on three occasions in 2017." The MOU also stated that "[t]he financial obligation resulting from 10 years loans due

6

from Levi [Quintana] to Jonathan [Kraut] as of 27 March 2017 is $827,110 to include $243,882 in draws."

## IV.    Complaint

On March 22, 2018, Kraut and SNP (collectively plaintiffs) filed a verified complaint against Quintana; both partnership agreements and the MOU were attached as exhibits.  Plaintiffs alleged that from "about April 1, 2007 through December 31, 2017, Kraut loaned to Secure Net Protection and Quintana $285,246.28 as a draw for living expenses while Secure Net Protection was being developed to be repaid by Quintana, which includes an amount of $3,084.00 from a previous, unpaid loan to Quintana, plus interest of $92,223.13 at 6% annual, for a total debt Quintana owes Secure Net Protection and Kraut jointly of $377,469.41."  Plaintiffs further alleged that the full sum "became due and payable when Quintana withdrew from Secure Net Protection effective January 1, 2018."  Since his withdrawal, plaintiffs alleged, Quintana "was actively soliciting existing customers of Secure Net Protection in violation of the Secure Partnership Agreement as Amended, his covenant not to compete, and his fiduciary duties."

Plaintiffs asserted four causes of action against Quintana, all of which incorporated all preceding allegations. In the first cause of action for misappropriation of trade secrets, plaintiffs alleged that Quintana misappropriated SNP's customer list, threatened to establish a competing company, and solicited customers on the list.  Plaintiffs alleged that Kraut initiated arbitration proceedings against Quintana on or about February 28, 2018, but a hearing could not take place until June 2018 even if Quintana cooperated and "the American Arbitration Association reports to Kraut that Quintana is not cooperating."

7

Due to their belief that Quintana would take customers from SNP "beginning April 1, 2018," plaintiffs requested a temporary restraining order and preliminary injunction "to preserve the status quo pending final resolution of Kraut and Secure Net Protection's dispute with Quintana."

In the second cause of action for breach of the covenant not to compete, plaintiffs alleged that Quintana breached the covenant contained in the new partnership agreement by actively soliciting SNP's customers after his departure. In the third cause of action for breach of fiduciary duty, plaintiffs alleged that Quintana violated his fiduciary duties to Kraut, Horton, and SNP "by soliciting business for his own account, misappropriating Secure Net Protection's trade secrets, and soliciting its employees for employment by his new entity." They further alleged that Quintana's conduct was wanton, malicious, and undertaken with the intent to injure plaintiffs. In the fourth cause of action for common count—money lent, plaintiffs alleged that "[w]ithin the last four years, Quintana became indebted jointly to Plaintiffs Secure Net Protection and Kraut for money lent to Defendant Quintana in the amount of $$285,246.28 [*sic*], plus interest of $92,223.13 at 6% annual, for a total debt Quintana owes of $377,469.41. No part of this obligation has been paid. This obligation became due and payable on January 1, 2018."

In their prayer for relief, plaintiffs requested injunctive relief on the first and second causes of action. For the fourth cause of action, they requested payment of the $377,469.41 Quintana allegedly owed, plus interest from January 1, 2018. For all causes of action, they requested at least $1,000,000 in compensatory damages, $400,000 in punitive damages,

8

prejudgment interest, attorney fees and costs, and any other relief the court deemed proper.

On April 20, 2018, the trial court issued a preliminary injunction enjoining Quintana from various conduct, including misappropriating SNP's property, soliciting its customers, and using SNP's name.

## V.     Arbitration

As previously noted, Kraut initiated arbitration with Quintana on or about February 28, 2018, prior to filing the lawsuit. Quintana filed an answering statement on or about June 7, 2018. In addition to denying and asserting affirmative defenses to Kraut's claims and allegations, Quintana asserted counterclaims against Kraut, Horton, and SNP, "including a request for compensatory damages of 'not less than $500,000' for numerous alleged torts, including breach of fiduciary duty and fraud, plus an order requiring Kraut and Horton to buy out his interest in SNP based on his alleged dissociation from SNP." Quintana also sought punitive damages, attorney fees, costs, and an accounting. Kraut and Quintana both subsequently made supplemental filings.

The arbitration proceeded to a four-day evidentiary hearing in February 2020. The arbitrator issued a 50-page written interim award on May 20, 2020. The interim award by its terms "fully and finally determines liability and damages with respect to the submitted claims" and "is in full settlement of all claims and requests for relief submitted in this arbitration." The only issues outstanding were attorney fees and costs. Those issues were resolved in the final award, issued August 7, 2020, which fully incorporated the interim award.

9

The arbitrator made numerous findings adverse to Quintana. For instance, she found that "Kraut was the more credible witness because he (a) rarely 'forgot' an important event, and (b) answered forthrightly and fully even when the truth was not flattering to him. Quintana, on the other hand, was only comfortable answering questions on direct exam and had a convenient lapse of memory when asked about things that were not favorable to him. Additionally, there were times when Quintana's answers to questions drilling down on the particulars of the underlying transactions and events came off sounding glib." The arbitrator further found that "to the extent that Kraut put any money into the venture, he required that Quintana agree, as between them as partners, that those monies would be treated as loans and not capital contributions." Indeed, she stated that the evidence was clear "that Kraut would not have agreed to be Quintana's partner without Quintana's agreement that any monies Kraut advanced would be repaid as loans." She also found that "any monies Quintana took out before or beyond profits were to be treated as loans," that any payments made to Quintana "in advance of profits being available for distribution to partners would be treated as 'loans from Kraut,'" that both parties were aware that SNP lost money every year from 2007 through 2015, and that Kraut "personally made sure that all of SNP's debts were paid as they came due, and that is the basis for which he has charged a note payable obligation due him from the partnership."

Notably, the arbitrator found that "Quintana does not dispute that he agreed both orally and in writing that the monthly stipend he received was a loan obligation to Kraut. The 2007 Agreement says exactly that, and Kraut provided a sample

of the initial set of checks written to Quintana during 2007 . . . , all of which state 'loan' in the memo section of the check." She also found that "Quintana acknowledged that he did not report the payments he received as income on his personal tax returns," and that SNP's QuickBooks database "reflected loan payments made to Quintana over the years."

The arbitrator ultimately concluded that "[t]he evidence established that Quintana received loans from both Kraut and SNP, that he understood and treated them as exactly that, and that he has no excuse or defense to avoid these obligations." She concluded that Quintana owed SNP $3,084.00 and Kraut $352,193.00. She also ruled that Kraut and SNP were entitled to $140,605.45 in attorney fees and costs as the prevailing parties.

## VI. Petitions to Confirm and Vacate

On December 30, 2020, Kraut and SNP filed a petition to confirm the arbitration award. The following day, Quintana filed a form petition to vacate the award. Quintana checked the box indicating that "the arbitrator exceeded his or her authority, and the award cannot be fairly corrected."

The trial court heard the reciprocal petitions on January 15, 2021. The minute order indicates that neither Quintana nor his counsel was present, but the signed order and judgment filed the same day indicate that Quintana's counsel was present. The trial court concluded that Quintana's petition to vacate was not timely filed within 100 days of the award's service on Quintana, as required by Code of Civil Procedure section 1288.[4] It further concluded the petition to vacate, "even if it had been timely, does not submit any evidence affirmatively challenging the award or

---

[4] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

the sufficiency of the evidence supporting confirmation." The court thus denied the petition to vacate, granted the petition to confirm, and entered judgment confirming the arbitration award.

On March 15, 2021, Quintana filed a motion to set aside the judgment on the ground that he had not been given notice of the January 15, 2021 hearing. The trial court heard and granted the motion on June 11, 2021. It ordered Quintana to respond to the petition to confirm by June 18, 2021, gave Kraut and SNP leave to reply, and stated that it would "hear the petition to confirm the arbitration award and the petition to vacate on July 16, 2021."

In his opposition to the petition to confirm, which he filed in propria persona, Quintana argued that the arbitrator exceeded her powers by ignoring evidence, much of which he attached to the filing. In their reply, Kraut and SNP argued that Quintana's petition to vacate should be denied as untimely and because Quintana "provides nothing to show that [the arbitrator] exceeded her authority." They further argued that the arbitration award should be confirmed.

The court heard the matter on July 16, 2021. It again concluded that Quintana's petition to vacate was untimely filed and lacked merit in any event. It further stated that it had reviewed the opposition and evidentiary materials Quintana filed, and "finds that defendant has failed to establish that the arbitrator exceeded the arbitrator's authority or that there is any other ground to vacate or correct the award." It explained that each of Quintana's arguments included "some component of credibility, the weight of the evidence, and the inferences drawn from the evidence, which is within the purview and authority of the arbitrator." It continued, "The court is not authorized to

12

substitute its evaluation of the evidence on these matters for that of the arbitrator, which is what is being requested here." The court concluded that "[s]ince there is no ground to vacate or correct the award, the petition to confirm the award will be granted, and the petition to vacate the award will be denied." It entered judgment confirming the arbitration award on March 11, 2022. Quintana timely appealed.

## DISCUSSION

"Any party to an arbitration in which an award has been made may petition the court to confirm, correct or vacate the award." (§ 1285.) "If a petition or response under this chapter is duly served and filed, the court shall confirm the award as made, . . ., unless in accordance with this chapter it corrects the award and confirms it as corrected, vacates the award or dismisses the proceeding." (§ 1286.) After a signed copy of the arbitration award is served on a party, the party has four years to seek confirmation of the award but only 100 days to file a petition to vacate it.[5] (§ 1288.)

"The scope of judicial review of arbitration awards is extremely narrow because of the strong public policy in favor of arbitration and according finality to arbitration awards." (*Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 33 (*Ahdout*).) Thus, "an arbitrator's decision is not generally reviewable for

---

[5] Kraut argues that Quintana's failure to challenge the trial court's ruling that his petition to vacate was untimely "alone compels affirmance." As Quintana points out, however, the trial court granted Quintana leave to file an opposition to the petition to confirm and considered the merits of the arguments raised therein, namely that the arbitrator exceeded her powers. We similarly consider whether the ruling was properly confirmed, not whether the petition to vacate was properly denied.

13

errors of fact or law, whether or not such error appears on the face of the award and causes substantial injustice to the parties." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 6 (*Moncharsh*).) "However, Code of Civil Procedure section 1286.2 provides limited exceptions to this general rule." (*Ahdout, supra,* 213 Cal.App.4th at p. 33.) "The party seeking to vacate an arbitration award bears the burden of establishing that one of the six grounds listed in section 1286.2 applies and that the party was prejudiced by the arbitrator's error." (*Royal Alliance Associates, Inc. v. Liebhaber* (2016) 2 Cal.App.5th 1092, 1106.)

Quintana relies on section 1286.2, subdivision (a)(4) as the statutory basis for challenging the award. Subdivision (a)(4) requires a court to vacate an award when "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (§ 1286.2, subd. (a)(4).) "'[W]hether the arbitrator exceeded his or her powers…, and thus whether the award should have been vacated on that basis, is reviewed on appeal de novo.'" (*Ahdout, supra,* 213 Cal.App.4th at p. 33.)

An arbitrator generally exceeds his or her powers only where he or she acts in a manner not authorized by the parties' contract or by law. This occurs when he or she "acts without subject matter jurisdiction [citation], decides an issue that was not submitted to arbitration [citation], arbitrarily remakes the contract [citation], upholds an illegal contract [citation], issues an award that violates a well-defined public policy [citation], issues an award that violates a statutory right [citation], fashions a remedy that is not rationally related to the contract [citation], or selects a remedy not authorized by law [citations]." (*Jordan v. California Dept. of Motor Vehicles* (2002) 100 Cal.App.4th 431,

14

443.) Arbitrators generally do not exceed their powers simply by reaching an erroneous conclusion on a contested issue of law or fact, and we may not vacate arbitral awards on the basis of such error. (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 917.)

Quintana contends the arbitrator exceeded her powers because she "inexplicably found that the parties had a written enforceable loan agreement by and between defendant and SNP, specifically that defendant's biweekly draws to him were loans without requiring any elements to establish a written contract as between the parties." He continues, "the arbitrator artificially created a valid and enforceable written loan agreement between the defendant and SNP without any material terms of a loan, including the loan amounts, interest rates, repayment terms, or the names of the parties to the loan." Quintana asserts that these acts violated both the common law governing contract formation and the statute of frauds set forth in Civil Code section 1624.

Although Quintana attempts to conform his challenges to the limited exceptions under which review is permissible, they are predicated upon the arbitrator's allegedly "inexplicable" findings and her interpretation of the parties' written agreements. These are matters outside the scope of our review. An arbitrator does not exceed her authority by making factual findings, inexplicable or not, or by interpreting the contract the parties agreed to have her interpret. (*Moncharsh*, *supra*, 3 Cal.4th at p. 6.)

To the extent that Quintana contends the contract was arbitrarily remade, we are not persuaded. The arbitrator grounded her ruling in the explicit written language of the parties' agreements as well as other evidence presented at the

hearing. We cannot review these factual and legal conclusions. To the extent he challenges the remedy fashioned by the arbitrator, the "critical question with regard to remedies is not whether the arbitrator has rationally interpreted the parties' agreement, but whether the remedy chosen is rationally drawn from the contract as so interpreted." (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 377.) The remedies here, repayment of loans Kraut made to Quintana and SNP and payment of attorney fees and costs, are plainly connected to the parties' agreements as interpreted by the arbitrator. The MOU, which was connected to the partnership agreements, specifically provided that "[t]he financial obligation resulting from 10 years loans due from Levi [Quintana] to Jonathan [Kraut] as of 27 March 2017 is $827,110 to include $243,882 in draws." The arbitrator's award of significantly less than that amount is not irrational and does not exceed her powers.

Quintana also argues that the arbitrator violated the statute of frauds "since the alleged oral agreement cannot be fulfilled or carried out in one year and exceeds the amount of $100,000." His reliance on the statue of frauds is unavailing for at least three reasons. First, "[t]he statute of frauds is treated as a rule of evidence which, if not properly raised, may be forfeited." (*Secrest v. Security National Mortgage Loan Trust 2002-2* (2008) 167 Cal.App.4th 544, 551.) Here, nothing in the appellate record, even as significantly augmented by Kraut, indicates that Quintana raised the statute of frauds at any point before the arbitrator or trial court. Second, the arbitrator expressly found that "Quintana . . . agreed both orally *and in writing* that the monthly stipend he received was a loan obligation to Kraut." This factual finding is beyond the scope of our review and

16

precludes the application of the statute of frauds.  Third, even if the statute of frauds were applicable and preserved, a contract that does not comply with the statute of frauds is not an illegal contract.  (*City of Los Angeles v. City Bank* (1893) 100 Cal. 18, 24.)  There is thus no basis from which to conclude the arbitrator exceeded her powers by upholding an illegal contract.

## DISPOSITION

The judgment is affirmed.  Kraut may recover his costs of appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

CURREY, P.J.

ZUKIN, J.

17