Filed 9/15/15 (unmodified opn. attached)

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JUDICIAL COUNCIL OF CALIFORNIA, ADMINISTRATIVE OFFICE OF THE COURTS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JACOBS FACILITIES, INC., et al.,<br><br>    Defendants and Respondents. | A140890, A141393<br><br>(San Francisco City & County Super. Ct. No. CGC-09495036) |
| JACOBS PROJECT MANAGEMENT, CO.,<br><br>    Cross-complainant and Respondent,<br><br>v.<br><br>JUDICIAL COUNCIL OF CALIFORNIA, ADMINISTRATIVE OFFICE OF THE COURTS,<br><br>    Cross-defendant and Appellant. | ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on August 20, 2015, be modified as follows:

1. On pages 14–15, delete the carryover paragraph beginning "Defendants do their best" in its entirety, including footnote 13.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.C.

2.  On page 26, in the first full paragraph, delete the last sentence, beginning "The holding of *Transamerica*."

3.  On page 26, the final partial paragraph beginning "We conclude *Transamerica*'s," add the following sentence in front of the first sentence:

> Assignment clauses in insurance policies are subject to uniquely applicable rules, including statutory restrictions on their enforcement.  (See, e.g., *Fluor Corp. v. Superior Court* (Aug. 20, 2015, S205889) ___ Cal.4th ___ [pp. 95–96] [Ins. Code, § 520 prohibits the enforcement of a nonassignment clause to bar recovery for a loss by a policy assignee].)

4.  On page 30, delete footnote 21 and add the following paragraph as the last paragraph of section II.A.4.:

> As a final matter, defendants contend that Management was entitled to recover the unpaid sums awarded by the jury even if Facilities was not, because the sums accrued at a time when Management, a licensed entity, was performing the services under the contract.  We find no legal basis for the claim.  Management lacks standing to recover under the contract because it was not a party to the contract during the time when the unpaid bills accrued.  (*Bleavins v. Demarest* (2011) 196 Cal.App.4th 1533, 1542–1543.)  While defendants asserted a claim for unjust enrichment in the counterclaim, it is well-established that equitable theories cannot be employed to overcome a failure of licensure.  (*Ahdout, supra,* 213 Cal.App.4th 21, 31.)  Because the contracting party, Facilities, was unlicensed at the time Management performed the services, Facilities' recovery was precluded by section 7031, subdivision (a).  The counterclaim improperly attempted to enlist the equitable theory of unjust enrichment to overcome Facilities' failure of licensure.

There is no change in the judgment.

Respondents' petition for rehearing is denied.

Dated:

_____
Dondero, Acting P.J.

2

Filed 8/20/15 (unmodified version)
**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JUDICIAL COUNCIL OF CALIFORNIA,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>JACOBS FACILITIES, INC., et al.,<br><br>        Defendants and Respondents.<br><hr>JACOBS PROJECT MANAGEMENT, CO.,<br><br>        Cross-complainant and Respondent,<br><br>v.<br><br>JUDICIAL COUNCIL OF CALIFORNIA,<br><br>        Cross-defendant and Appellant. | A140890, A141393<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-09495036) |

Plaintiff Judicial Council of California, Administrative Office of the Courts (JCC) entered into a contract with defendant Jacobs Facilities, Inc. (Facilities), a wholly owned subsidiary of defendant Jacobs Engineering Group Inc. (Jacobs). Performance of the contract required a license issued pursuant to the Contractors' State License Law (Bus. & Prof. Code,[1] § 7000 et seq.; CSLL), and Facilities was properly licensed when it

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.C.

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated.

commenced work. In the ensuing months, Jacobs, as part of a corporate reorganization, transferred the employees responsible for performing the JCC contract to another wholly owned subsidiary. In the process, Jacobs caused the new subsidiary to obtain a contractor's license, while permitting the Facilities license to expire. Notwithstanding the lapse of its license, Facilities remained the signatory on the JCC contract until nearly a year later, when the parties entered into an assignment of the contract to the new, licensed subsidiary.

JCC sued Jacobs and the two subsidiaries under section 7031, subdivision (b), which requires an unlicensed contractor to disgorge its compensation. JCC sought return of all monies paid to Facilities under the contract, some $18 million. In response, the defendants contended (1) Facilities had complied with the CSLL, (2) Facilities had "internally" assigned the contract to the new subsidiary prior to expiration of its license, (3) JCC ratified the internal assignment when it consented to the assignment to the new subsidiary, and (4) Facilities had "substantially complied" with the CSLL under the provisions of section 7031, subdivision (e).

When the matter was called for trial, defendants requested a hearing on the issue of substantial compliance. The trial court deferred that hearing until after a jury trial on defendants' other defenses to JCC's claim. After the jury found for defendants, the substantial compliance hearing was never held.

JCC appeals the denial of its motion for judgment notwithstanding the verdict and the trial court's award of attorney fees to defendants. We reverse the judgment and attorney fees award entered on the jury's verdict, concluding Facilities violated the CSLL when it continued to act as the contracting party after its contractor's license expired. We decline to order entry of judgment for JCC, however, because defendants remain entitled to an opportunity to prove their substantial compliance under the statute. We remand for a hearing pursuant to section 7031, subdivision (e).

## I. BACKGROUND

JCC is the administrative agency of California's judicial branch. In 2005, JCC issued a request for proposals (RFP) for the provision of maintenance and repair services

2

to courthouses and other judicial branch buildings throughout Southern California. The successful respondent was Facilities, a wholly owned subsidiary of Jacobs, which is a publicly traded corporation.

JCC and Facilities entered into a three-year facilities maintenance and repair agreement (the contract) in April 2006. The contract anticipated Facilities would organize, supervise, and bill for building repair and maintenance, while retaining subcontractors to perform some or all of the actual repair work. Among the provisions pertinent to this lawsuit, the contract precluded its assignment by Facilities, "in whole or in part," without JCC's written consent. Facilities also represented and warranted it held a class B contractor's license and agreed it would secure and maintain all licenses required for the performance of work under the contract.

Facilities commenced work under the contract, which covered a total of 121 buildings, in April 2006. In performing the contract, Facilities employees provided only administrative and oversight services, while retaining subcontractors to perform actual maintenance and repair work. When work was completed, Facilities recorded its completion in a dedicated computer system and generated an invoice. The invoices called for payment to Facilities, but the account to which JCC was directed to remit payment was a general Jacobs account from which Jacobs allocated payments among its subsidiaries.

In December 2006, Jacobs undertook a "branding initiative" designed, among other things, to reduce the costs associated with maintaining its many subsidiaries. As part of this initiative, Jacobs decided to dissolve Facilities and transfer its employees to Jacobs. Although the liquidation of Facilities into Jacobs was accomplished pursuant to a document effective December 2006, Facilities was not actually dissolved as a corporate entity until September 2010. The change in corporate structure did not affect performance of work under the contract, which was carried on in the same way by the same persons, but those persons appear to have become employees of Jacobs in

January 2007.[2]  Throughout the reorganization, Facilities continued to invoice for payment and execute contractual amendments as necessary, and insurance and bonds required under the contract continued to be maintained in the name of Facilities.

Defendant Jacobs Project Management Co. (Management) was formed in January 2008, as a wholly owned subsidiary of Jacobs.[3]  Under a written agreement, Jacobs transferred 713 employees, including some former Facilities employees, to Management, as well as the "fixed assets use[d] by those employees."  It appears all employees providing services to JCC under the contract became employees of Management in February 2008, although the record is not wholly clear on this point.[4]  Throughout 2008, Jacobs allocated compensation received from JCC under the contract to Management, rather than Facilities.  As before, actual work under the contract was unaffected, and invoices sent to JCC continued to instruct it to remit payment to "Jacobs Facilities Inc."

When a corporation applies for a contractor's license, it must designate a "qualifying individual," a corporate officer or employee who is qualified for the same license classification for which the corporation is applying.  (§ 7068, subd. (b)(3).)  Once the license issues, the qualifying individual is "responsible for exercising that direct

---

[2] It is unclear from the record when and how many of the Facilities employees became Jacobs employees.  The Facilities employee who was ultimately responsible for overseeing the contract, Scott McCallister, became a Jacobs employee in January 2007. The general import of the testimony was that the other employees who provided services under the contract were also transferred to Jacobs at this time, as called for by the reorganization documents.  McCallister continued to serve as an officer of Facilities after his transfer to Jacobs's employment.

[3] As the context requires, we will refer to Jacobs, Facilities, and Management jointly as "the Jacobs entities" or "defendants."

[4] As with the transfer of employees to Jacobs in 2007, there is testimony that the employment of McCallister and another employee involved in providing services under the contract, along with that of unspecified other Facilities employees, was transferred to Management in February 2008, but the record does not specifically identify those employees as the persons providing services under the contract.  There is no dispute those persons became employees of Management at some point, and there is no testimony suggesting any later date for their transfer.

4

supervision and control of his or her employer's or principal's construction operations to secure compliance with this chapter and the rules and regulations of the board." (§ 7068.1, subd. (a).)  The qualifying individual for the Facilities license was Scott McCallister.  He remained in that position until August 12, 2008, at which time he voluntarily withdrew.  Three days later, Management was issued a class B contractor's license, on which McCallister was the qualifying individual.  Because Facilities failed to designate another qualifying individual, its contractor's license was suspended, and the license expired by operation of law in November 2008.  (§ 7068.2, subd. (c).) McCallister's withdrawal as the qualifying individual on the Facilities license was not legally necessary to permit him to serve in that role for Management, since the Business and Professions Code permits such overlap.  (§ 7068.1, subds. (a), (b).)

At trial, Jacobs claimed to have performed an "internal assignment" of the contract from Facilities to Management on the date the new license was issued to Management, but the internal assignment was not documented by a written contract or, it appears, any other writing.  In explaining the internal assignment, Jacobs's witnesses said the company assigned performance of the "business functions" of Facilities to Management— essentially, transferring responsibility for performing "the work" under the contract—as of the date of Management's licensure.  If the Jacobs entities told JCC of the internal assignment, it was not until much later.

Although Facilities had begun divesting itself of assets and employees in December 2006, the Jacobs entities' first documented mention of the reorganization to JCC is an e-mail from April 2008, sent in connection with the negotiation of a different contract.  At that time, a Jacobs employee told JCC that, as a result of a corporate reorganization, Facilities would not be the contracting entity on the new contract.  During a subsequent exchange of e-mails, the employee explained that Jacobs intended to "novate" existing Facilities contracts to Management, once Management acquired the necessary contractor's license.  In response, a JCC employee confirmed his understanding that Jacobs intended to transfer the contract to a new operating entity.

5

Jacobs did nothing to implement the intended novation of the contract until December 2008, when a Jacobs employee sent a copy of a proposed novation agreement to JCC under a "to whom it may concern" cover letter. Although JCC directed the letter to a responsible JCC employee, neither he nor anyone else at JCC responded to it, and Jacobs did nothing to follow up until eight months later, in August 2009, when the same Jacobs employee sent the same proposed novation agreement again, this time addressing the cover letter to a particular JCC employee. In the meantime, in February 2009, JCC exercised the first of three discretionary one-year extensions of the contract. McCallister executed the agreement extending the contract on behalf of Facilities.

Jacobs's August 2009 letter seeking consent to a novation did raise a response from JCC, but the parties displayed no urgency in transferring the contract until JCC learned in October 2009 that Facilities had allowed its contractor's license to lapse nearly a year earlier. JCC was particularly concerned about appearances that the "Administrative Office for the Courts, which represents the justice system, had a contractor who was not in compliance with the law." As a cure, the parties entered into an agreement assigning the contract to Management in November 2009. Hereafter, we will refer to this agreement as the "assignment," distinguishing it from Jacobs's earlier internal reassignment of duties to Management, which we will refer to as the "internal assignment."

JCC filed this action in December 2009 against Facilities and Management. The operative complaint, JCC's second amended complaint (complaint), joined Jacobs as well. The complaint alleges three causes of action: breach of contract growing out of the expiration of Facilities' contractor's license;[5] disgorgement under section 7031, subdivision (b), which allows a person who has employed an unlicensed contractor to

---

[5] In this cause of action, JCC included an allegation that Facilities and Management "fail[ed] to purchase and manage all materials, equipment, and subcontracts consistent with sound business practices," but that contention seems never to have been pursued. We are unaware of any evidence in the record to suggest the Jacobs entities' performance of the work was deficient.

6

obtain "all compensation paid" to the contractor; and breach of guaranty against Jacobs. Management cross-claimed against JCC for compensation payable under the contract that JCC began to withhold after it learned the Facilities license had expired.

JCC's statutory and contract claims were bifurcated, and the statutory claims proceeded to trial in April 2012. Prior to trial, defendants requested a "substantial compliance" hearing from the trial court. Under section 7031, subdivision (e), a contractor who has failed strictly to comply with the CSLL can avoid disgorgement if the "court" determines that the contractor substantially complied, as defined in subdivision (e). Among other elements, the contractor must show that it "acted reasonably and in good faith to maintain proper licensure." (§ 7031, subd. (e)(2).) The court granted defendants' request, but it deferred the hearing until "after the case went to the jury."

Responding to a special verdict, the jury found Facilities had maintained a contractor's license at all times while performing the contract; Facilities had "internally assign[ed]" the contract to Management prior to the expiration of the Facilities license; JCC was not "adversely affect[ed]" by the internal assignment; and Management was owed $4,669,376. The jury also found that Facilities had been paid $18,331,911 by JCC for its work under the contract, but the jury declined to require Facilities to disgorge that amount. The deferred substantial compliance hearing was never held.

In November 2013, JCC dismissed with prejudice its contract cause of action, and Management dismissed the claims in its cross-complaint seeking relief other than recovery under the unpaid invoices. On motion of the Jacobs entities, the trial court entered a defense judgment on JCC's statutory claim and Management's counterclaim for unpaid invoices, requiring JCC to pay Management the $4.7 million found by the jury. The court thereafter summarily denied JCC's motion for judgment notwithstanding the verdict (JNOV). In February 2014, the trial court granted the Jacobs entities' motion for contractual attorney fees.

JCC appeals the denial of its motion for JNOV and the award of attorney fees.[6]

## II.  DISCUSSION

### A.  *Denial of JCC's JNOV Motion*

The evidence is essentially undisputed that Facilities contracted to deliver services requiring a contractor's license, allowed its license to expire, and continued to deliver the services while unlicensed.  On its face, this would appear to constitute a violation of the CSLL, entitling JCC to the remedies specified in section 7031.  While it might be argued that the violation was merely a technical one, given Management's licensure, this is an argument for substantial compliance, an issue deferred by the trial court.  Accordingly, the question before the jury, and now before us, was whether defendants *strictly* complied with the statute.  Any failure of compliance, whether or not technical or de minimis, requires reversal of the jury's verdict.

Defendants argue we can affirm the jury's conclusion the requirements of the CSLL were met because (1) they did not violate the CSLL because the statute does not penalize changes in a contractor's form of business; (2) the internal assignment of the contract from Facilities to Management prevented a violation; or (3) in executing the assignment, JCC retroactively ratified an assignment from Facilities to Management as of the time Management acquired its license, thereby avoiding a violation.  We find none of these arguments sufficient to uphold the verdict.

#### 1.  *Applicable Law*

The CSLL provides "a comprehensive scheme which governs contractors doing business in California."  (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 282 (*Asdourian*).)  "The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services.  [Citation.]  The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business."  (*Hydrotech*

---

[6] The appeals of the two orders were filed separately and have been consolidated.

8

*Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995 (*Hydrotech*).)  For purposes of the CSLL, "a contractor is any person who undertakes to or offers to undertake to . . . , or does himself or herself or by or through others, construct, alter, [or] repair . . . any . . . structure, project, development or improvement, or to do any part thereof . . . ."  (§ 7026.) There is no dispute the work undertaken by Facilities in the contract required a contractor's license.

The two provisions of the CSLL of concern here are designed to enforce compliance with the CSLL's licensing requirements.  Section 7031, subdivision (a) provides that no person "engaged in the business or acting in the capacity of a contractor" can bring an action for compensation for work requiring a contractor's license if the person was not properly licensed at all times during the performance of the work.[7] Section 7031, subdivision (b) goes further, permitting a person "who utilizes the services of an unlicensed contractor" to bring an action for disgorgement of "all compensation paid to the unlicensed contractor."[8]  Although the language of the two provisions is somewhat different, they are interpreted "in a consistent manner, resulting in the same remedy regardless of whether the unlicensed contractor is the plaintiff or the defendant." (*Alatriste v. Cesar's Exterior Designs, Inc.* (2010) 183 Cal.App.4th 656, 666 (*Alatriste*).) The statutory intent behind subdivisions (a) and (b) is "to discourage persons who have failed to comply with the licensing law from offering or providing their unlicensed

---

[7] Section 7031, subdivision (a) states in full:  "Except as provided in subdivision (e), no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract, regardless of the merits of the cause of action brought by the person, except that this prohibition shall not apply to contractors who are each individually licensed under this chapter but who fail to comply with Section 7029."

[8] Section 7031, subdivision (b) states in full:  "Except as provided in subdivision (e), a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract."

9

services for pay." (*Hydrotech, supra*, 25 Cal.3d at p. 995.) Because the remedies of subdivisions (a) and (b) of section 7031 are essentially two sides of the same coin in denying compensation to an unlicensed contractor, we will refer to the remedies jointly as "forfeiture." Both aspects of forfeiture are involved here, since JCC seeks disgorgement of compensation paid under subdivision (b), while the Jacobs entities were awarded a judgment for compensation withheld by JCC, which subdivision (a) would preclude them from recovering if a CSLL violation were found.

Because it denies all compensation for a contractor's work, regardless of the quality of the work or the reasons for the failure of licensure, section 7031 can have harsh and seemingly unfair effects. To mitigate these effects, our courts developed, in the decades prior to 1990, the doctrine of "substantial compliance," which was applied "in exceptional circumstances [when] the purposes of the [CSLL] are not furthered by strict enforcement of section 7031." (*Asdourian, supra*, 38 Cal.3d at p. 282.) Recognizing the " 'the severity of th[e] sanction' " imposed by section 7031, the courts did not "insist[] on literal compliance [with the CSLL] in the situation in which the party seeking to escape his obligation has received the full protection which the statute contemplates.' " (*Asdourian*, at pp. 282–283.) To excuse a failure of strict compliance with the CSLL by invoking the doctrine of substantial compliance, "the test [was] whether the contractor's 'substantial compliance with the licensing requirements satisfies the policy of the statute.' " (*Latipac, Inc. v. Superior Court* (1966) 64 Cal.2d 278, 281.)

Judicial discretion in the enforcement of section 7031 came to an end in 1989, when the Legislature amended section 7031 to abolish the doctrine of substantial compliance. The new language stated unequivocally: "The judicial doctrine of substantial compliance shall not apply to this section." (Stats. 1989, ch. 368, § 1, p. 1509; see *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 429 (*MW Erectors*).) In an extensive discussion of the amendment, *MW Erectors* characterized the statutory history as making clear the Legislature intended "to narrow a 'loophole' created by the *courts'* use of the substantial compliance doctrine to avoid 'apply[ing] the licensing law strictly.' " (*Id.* at p. 430.) The

10

unequivocal language of the amendment communicates unambiguously the Legislature's insistence on strict enforcement of section 7031. Although statutory amendments since 1989 have reintroduced a limited defense of substantial compliance, via subdivision (e) of section 7031, compliance with the terms of subdivision (e) is the exclusive means for avoiding forfeiture in the event of a violation of CSLL.[9] (*MW Erectors*, at pp. 429, 432–434; *Pacific Caisson & Shoring, Inc. v. Bernards Bros. Inc.* (2011) 198 Cal.App.4th 681, 694.)

Courts have taken their cue from the Legislature in enforcing the letter of the law, consoled by the Legislature's " ' "determination that the importance of deterring unlicensed persons from engaging in the contracting business outweighs any harshness between the parties." ' " (*MW Erectors, supra*, 36 Cal.4th at p. 423, italics omitted.) Accordingly, if a contractor is unlicensed for any period of time while delivering construction services, the contractor forfeits *all* compensation for the work, not merely compensation for the period when the contractor was unlicensed. (*Alatriste, supra*, 183 Cal.App.4th at p. 665.) Although construction contractors often make substantial payments to others for materials and labor, an unlicensed contractor forfeits all money paid, without offsets for such payments to third parties. (*Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 31 (*Ahdout*).) Because section 7031 is held to apply " '[r]egardless of the equities' " (*MW Erectors*, at p. 423), unlicensed contractors are prohibited from asserting equitable defenses, such as estoppel, to forfeiture. (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1455 (*Twenty-Nine Palms*).) On the contrary, " ' "[c]ourts may not resort to equitable considerations in defiance of section 7031." ' " (*Ahdout*, at p. 31.) As a result, an unlicensed contractor is subject to forfeiture even if the other contracting party was aware of the contractor's lack of a license, and the other party's bad faith or unjust enrichment cannot be asserted by the contractor as a defense to forfeiture. (*MW Erectors*, at p. 424.) For a contractor failing to

---

[9] As discussed *ante*, the issue of statutory substantial compliance by the Jacobs entities under subdivision (e) of section 7031 was raised below but not resolved.

11

qualify under the statutory safe harbor of subdivision (e), section 7031 is truly a strict liability statute.

" ' "The trial court's power to grant a motion for JNOV is the same as its power to grant a directed verdict. [Citation.] The court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and indulging in every legitimate inference that may be drawn in support of the judgment. The court may grant the motion only if there is no substantial evidence to support the verdict. [Citations.] On appeal from the denial of a motion for JNOV, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict." ' " (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1237.) Where, however, the trial court's denial of JNOV is based on an issue of law, our review is de novo. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)

## 2. *Penalizing Changes in Business Form under the CSLL*

As suggested above, we agree with JCC that, on the basis of what is materially undisputed evidence, the Jacobs entities failed to comply with the CSLL. The analysis is straightforward. Facilities contracted with JCC to supply services requiring a contractor's license. Although Facilities was licensed at the time the contract was made, its license expired in November 2008. Yet Facilities continued to deliver services and accept compensation from JCC as the signatory under the contract until November 2009, when the assignment was executed. Because Facilities was unlicensed for a portion of the period of its contract performance, its compensation under the contract is subject to forfeiture under subdivisions (a) and (b) of section 7031.

Defendants argue section 7031 was not intended to penalize a violation resulting from a mere change in business form, citing language to similar effect from *E. J. Franks Construction, Inc. v. Sahota* (2014) 226 Cal.App.4th 1123 (*Franks*). In *Franks*, the sole shareholder of the plaintiff corporation entered into a home construction contract as a sole proprietorship. During performance of the contract, he incorporated the business, creating the plaintiff corporation, and the contractor's license that had been issued to him

12

in his personal capacity was reissued to his corporation.[10] (*Franks,* at p. 1126.) The corporation then took over work on the residence. (*Id.* at pp. 1126, 1131.) The defendants sought to avoid payment for the corporation's work under section 7031, arguing it was not licensed at all times during the performance of the contract. (*Franks,* at p. 1126.) The court held section 7031 inapplicable because at no time was work on the home provided by an unlicensed contractor; rather, the court found, the circumstances involved a mere change in business entity by a licensed contractor, thereby maintaining proper licensure throughout. Section 7031, the court concluded, "is not intended to deter *licensed* contractors from changing a business entity's status and obtaining a reissuance of the license to the new entity during a contract period." (*Franks,* at p. 1129.)

While *Franks* may have reached the correct result on its facts, the broad interpretation of its language urged by defendants cannot be justified, and the decision should only cautiously be applied beyond the precise situation before that court. *Franks* never mentions the doctrine of substantial compliance, but to the extent the court purported to approve the delivery of services under a construction contract by an entity that was not licensed at the time work on the construction began, the court was necessarily invoking the now defunct doctrine.[11] While it may be true that section 7031 was not intended to deter licensed contractors from changing the form of a business entity, there is nothing in the statute to suggest that a violation of the CSLL occurring during or as a result of such a change is excused. On the contrary, by restricting the doctrine of substantial compliance to the circumstances established in section 7031,

---

[10] Under the CSLL, a contractor's license number may be reissued when an individual licensee forms a corporation majority-owned by the licensee. (§ 7075.1, subd. (c)(5).)

[11] In fact, *Franks* does not stand for this proposition. As JCC points out, *Franks* also based its holding on the apparently separate ground that the damages awarded to the corporation "do not pertain to . . . work performed pursuant to the contract Franks, as an individual or sole proprietor, entered into . . . ." (*Franks, supra*, 226 Cal.App.4th at p. 1131.) Instead, the corporation only performed additional work not included in the contract. (*Ibid.*) For that reason, JCC reasonably argues, the decision's pronouncements about the CSLL are dicta.

13

subdivision (e), the Legislature implicitly ruled that any CSLL violation not satisfying subdivision (e), regardless of its cause, is subject to section 7031.[12]

For purposes of this decision, however, we need not decide whether *Franks* was correctly reasoned. It is sufficient to note the decision's rationale rested heavily on the continuity of licensure resulting from reissuance of the license of the sole proprietorship to the corporation, in effect perpetuating the license. As the court held, the CSLL was not intended to deter a contractor from changing its business form and "obtaining a reissuance of the license to the new entity." (*Franks, supra*, 226 Cal.App.4th at p. 1129.) That is not what happened here. Facilities did not change its business form, nor did it transfer its license to another entity. Rather, an entirely new entity was created, and a new contractor's license was issued to Management. Following the licensure of Management, Facilities retained both its corporate existence and its license, although the license was suspended and eventually expired. Unlike the hand-off of both license and business form that occurred in *Franks*, Jacobs maintained two separate business entities and two licenses for a significant period of time. The continuity of license and business entity that was central to the rationale of *Franks* was not present here.

Defendants do their best to analogize the circumstances here to those in *Franks*, but their situation is different in critical ways. Defendants argue that during the "challenged period," which they define as the time between the expiration of Facilities' license and the execution of the assignment, a licensed contractor, Management, was performing the contract, and all payments made under the contract during that time were allocated to Management, thereby preventing an unlicensed entity from receiving

---

[12] If there is any doubt about the applicability of the substantial compliance doctrine in the circumstances confronting *Franks*, the answer is found in *Weiman v. Superior Court* (1959) 51 Cal.2d 710, in which the Supreme Court excused a failure of licensure essentially identical to that in *Franks* by invoking the substantial compliance doctrine. (*Weiman,* at pp. 713–714.) *Franks* does not cite or discuss either *Weiman* or an earlier case reaching a similar result, *Citizens State Bank v. Gentry* (1937) 20 Cal.App.2d 415. Both, of course, were decided prior to the Legislature's abolition of the substantial compliance doctrine.

compensation. The statute, however, requires licensure throughout a period of "work," not merely during a selected time period during the performance of the contract (*Alatriste, supra*, 183 Cal.App.4th at p. 665), and the circumstances prevailing throughout the contract period diverge significantly from defendants' characterization. First, because the employees of Facilities appear to have been transferred to the employment of Jacobs in 2007, and then to Management in February 2008, well before its licensure, services under the contract were actually performed by unlicensed entities for over 18 months, from January 2007 to mid-August 2008. Second, Management was allocated compensation received under the contract for the entirety of 2008, not merely after November. To the extent the internal allocation of funds is relevant, funds were credited to an unlicensed entity for the first seven months of 2008.[13] Finally, while the compensation after 2007 may have been allocated to Management by Jacobs, it was Facilities that collected the money by placing its name on the invoices. An unlicensed entity therefore *received* the compensation after October 2008. In short, this was not a seamless situation, like *Franks*, in which both license and performance were transferred from one entity to another at precisely the same time, thereby preventing a period of noncompliance.

In arguing their corporate reorganization did not result in a violation of the CSLL, defendants contend disgorgement in these circumstances does not serve the statutory purposes. Part of the Legislature's purpose, however, was to impose "strict and harsh penalties" (*MW Erectors, supra*, 36 Cal.4th at p. 418) in order to ensure contractor compliance with the statute. As the Supreme Court noted in *Hydrotech*: "The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who

---

[13] Defendants claim in their brief that "no compensation was received by an unlicensed contractor." In fact, it was Facilities that invoiced and received all compensation prior to the assignment, and Facilities was unlicensed for part of that time. Yet even if we accept defendants' argument regarding internal allocation of the funds, the claim is incorrect. The testimony in the record is undisputed that Management was allocated funds received from JCC under the contract for the entire tax year 2008, although it was not licensed until August of that year.

provide building and construction services. [Citation.] . . . [¶] Section 7031 advances this purpose by withholding judicial aid from those who seek compensation for unlicensed contract work. The obvious statutory intent is to discourage persons who have failed to comply with the licensing law from offering or providing their unlicensed services for pay. [¶] Because of the strength and clarity of this policy, it is well settled that section 7031 applies despite injustice to the unlicensed contractor. 'Section 7031 represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business *outweighs any harshness between the parties*, and that such deterrence can best be realized by denying violators the right to maintain any action for compensation in the courts of this state.' " (*Hydrotech, supra*, 52 Cal.3d at p. 995.) To the extent of serving that deterrent purpose, loss of compensation by the Jacobs entities was fully within the Legislature's intent.

Yet we acknowledge penalizing the Jacobs entities for these technical transgressions only indirectly serves the CSLL's larger purpose of preventing the delivery of services by unqualified contractors, since the Jacobs entities were neither dishonest nor incompetent.[14] For better or worse, however, this is beside the point. The doctrine of substantial compliance, as developed by the courts, attempted to limit the forfeiture remedy to circumstances in which that remedy served the larger statutory purpose. In that form, the doctrine was rejected by the Legislature. It is preserved in a restricted statutory form; thus, courts can no longer exercise discretion in the application of the doctrine. To avoid forfeiture for a CSLL violation, a contractor must now satisfy the terms of section 7031, subdivision (e). (See generally *MW Erectors, supra*, 36 Cal.4th at pp. 432–434.) To the extent the contractor fails to satisfy that exception, the courts have no choice but to allow forfeiture, regardless of the nature of the violation or

---

[14] We reject JCC's argument that defendants were in any way dishonest or incompetent in carrying out the contract. There is simply no evidence in the record to support either characterization. Jacobs's failure of licensure was a result of the manner in which it carried out its corporate reorganization, which had no apparent impact on the manner in which it performed services under the contract.

16

its relation to the larger ends of the CSLL. "Our function is to ascertain and give effect to legislative intent, and 'not to determine whether the Legislature's policy choices were right or wrong.' [Citation.] Courts may not evaluate the desirability of the policies embodied in legislation. ' "[T]he choice among competing policy considerations in enacting laws is a legislative function." ' " (*Alatriste, supra,* 183 Cal.App.4th at p. 672.) While we appreciate the potentially great harshness of this legislation in these circumstances, any argument for expansion of the substantial compliance doctrine must be directed to the Legislature.

### 3. *The Effect of the Internal Assignment*

Defendants argue Facilities internally assigned the contract to Management after its acquisition of a license in August 2008, thereby avoiding a violation upon the expiration of Facilities' license. We conclude the internal assignment was irrelevant to the issue of CSLL compliance because Facilities continued to act in the capacity of a contractor until November 2009, when it was relieved of that role by the assignment. Facilities was therefore required by the CSLL to maintain a contractor's license until that time.[15]

As a practical matter, the internal assignment shifted responsibility for providing services under the contract from Facilities to Management. The requirement of licensure under section 7031, however, does not necessarily adhere to the person who is performing services under a construction contract. Rather, a license is required for any person who is "engaged in the business or acting in the capacity of a contractor." (*Id.*, subd. (a).) Following the internal assignment, Facilities did not cease its involvement in the contract. On the contrary, Facilities continued as the signatory on the contract,

---

[15] JCC contends there is no substantial evidence to support the jury's finding of an internal assignment. Well before Jacobs claims to have undertaken the internal assignment, it informed JCC that it intended to transfer responsibility for the contracts to Management after Management obtained a license. Management thereafter acquired a license, and its employees delivered services to JCC under the contract. We assume for purposes of argument that this constitutes substantial evidence to support the jury's finding.

17

executed amendments to it, issued invoices and received payments, and maintained in its own name on the insurance and bond required under the contract.  Because JCC was given no formal notification of the change, it continued to look to Facilities for performance.  By continuing to serve after the internal assignment as the contracting entity in connection with work requiring a contractor's license, Facilities continued to act "in the capacity of" a contractor, notwithstanding Jacobs's delegation of performance to Management.  Facilities therefore was required to be licensed until the time it was relieved of this role by the assignment.

Controlling in this regard is *Opp v. St. Paul Fire & Marine Ins. Co.* (2007) 154 Cal.App.4th 71.  The plaintiff in *Opp*, an individual, was a licensed contractor who served as the president of an unlicensed corporation.  Opp's corporation executed a subcontract for construction services under his individual license number.  When Opp brought an action for payment, the defendant asserted the bar of section 7031, subdivision (a), arguing the corporate signatory to the contract was unlicensed.  (*Opp*, at pp. 72–73.)  Opp claimed section 7031 was inapplicable because he used his personal license number in executing the contract, personally supervised the work, and dealt with the general contractor as a sole proprietor.  (*Opp*, at p. 74.)  The court rejected the argument, distinguishing between Opp's performance of work under the subcontract and his corporation's agreement to deliver that performance.  As the court reasoned, the CSLL does not necessarily require "the person who 'does the work' " to possess a license, but rather the person who qualifies as a contractor under the statute by acting in the capacity of a contractor.  (*Opp*, at pp. 74–75.)  Such a person, the statute recognizes, can perform construction services "himself or herself or by or through others."  (§ 7026.)  As the court concluded, "The issue, then, is not who 'did the work,' but who was 'engaged in the business or acting in the capacity of a contractor.' "  (*Opp*, at p. 75.)  Because Opp's corporation undertook to provide construction services by executing the contract, the court held, the corporation was required by the CSLL to possess a license, and its failure to possess a license precluded its recovery of compensation for the work.

(*Opp*, at p. 75; see similarly *Montgomery Sansome LP v. Rezai* (2012) 204 Cal.App.4th 786, 797; *Twenty-Nine Palms, supra,* 210 Cal.App.4th at pp. 1449–1450.)

Putting aside the issue of ratification, considered below, there is no evidence to suggest JCC gave its written consent to a transfer of responsibilities, required by the contract to effect a valid assignment, prior to November 2009. Without the consent of the obligee, the delegation of a duty by an obligor under a contract does not extinguish the obligor's duty. (Rest.2d Contracts, § 318, p. 19.) Accordingly, even if Facilities unilaterally delegated its duties under the contract through an internal assignment to Management in August 2008, Facilities remained responsible to JCC for the delivery of services. Further, as noted above, Facilities continued to act as the contracting party vis-à-vis JCC, executing contract amendments, maintaining insurance, and sending invoices in its own name. Under the rule of *Opp*, Facilities' delegation of performance under the contract to Management did not relieve Facilities of its obligation under the CSLL to remain licensed so long as it was obligated to deliver services under the contract.

For this reason, we conclude the jury's finding that Facilities maintained a contractor's license "at all times while engaged in the business or acting in the capacity of a contractor in connection with" the contract is not supported by substantial evidence. The evidence is undisputed that Facilities continued to act as a contractor by remaining the signatory on the contract and accepting compensation even after its license expired in November 2008. Defendants contend that Management's assumption of day-to-day work under the contact provided evidence to support the jury's finding but Management's performance of such work did not preclude Facilities from continuing to act as a contractor. In remaining the signatory on the contract, continuing to secure bonding and insurance, executing contract amendments, and soliciting and receiving payments, Facilities continued to act as a contractor after the lapse of its license. Management's assumption of day-to-day duties is not evidence to the contrary.

Defendants argue that following the internal assignment, Facilities was merely a surety of Management's performance and therefore did not require a license, citing *Wiseman v. Sklar* (1930) 104 Cal.App. 369 and *Cutting Packing Co. v. Packers' Exch.*

19

(1890) 86 Cal. 574, 577. Neither case relieves Facilities of its responsibilities here. In a sentence quoted only partially by Facilities in its brief, the *Wiseman* court explained the effect of an unconsented assignment: " 'The obligations of an assignor of a contract continue to rest upon him and he will be required to respond to the other party to the contract in the event of a default on the part of the assignee.' " (*Id.* at p. 374.) As a result, "irrespective of the legality or lack of legality of the assignment, [the assignor] was at all times responsible to [the other parties] under the contract." (*Id.* at pp. 374–375.) As this demonstrates, *Wiseman* does not suggest that, following an unconsented assignment, the obligor under a contract is relegated to the role of surety. *Cutting Packing* is similar. While the decision refers to the assignor as a surety, the term is used only to describe the assignor's relationship to the assignee; that is, if the assignee failed to pay, the assignor would be required to pay. With respect to the obligee under the contract, "the burden of the obligation that rested upon the [assignor] . . . could not be transferred without the consent of [the obligee]. [Citation.] And as he refused to consent . . . the relations of himself and the plaintiff as to such burden were not affected by the assignment of the contract." (*Id.* at p. 576.)[16] Accordingly, as to JCC, the internal assignment did not alter Facilities' duties under the contract.

Yet even if Facilities became a common law surety, it would not have been relieved of the duty of licensure under the CSLL, given its continued status as the contracting party after the internal assignment. Section 7044.2, the exception for sureties cited by Facilities, applies only to an "admitted surety insurer," and only when it "engages a contractor to undertake the completion of a contract on which a performance or completion bond was issued by the surety insurer." There is no evidence Facilities was an admitted surety insurer or had issued a bond to guarantee performance. (See

---

[16] The Supreme Court confirmed this principle in *Peiser v. Mettler* (1958) 50 Cal.2d 594: "It has sometimes been said that the effect of an assignment is to make the lessee a surety for the assignee. [Citations.] This may be true in a limited sense as between the assignee and his assignor, the lessee, but as between the lessor and the lessee the latter remains a primary obligor under his express contract to pay rent." (*Id.* at p. 602.)

20

Code Civ. Proc., § 995.120, subd. (a) [defining admitted surety insurer as "a corporate insurer or a reciprocal or interinsurance exchange" licensed under the Ins. Code].) Nothing in the Business and Professions Code outside section 7044.2 exempts a surety from the requirement of licensure while acting in the capacity of a contractor.

Defendants also argue the internal assignment did not require JCC's approval because it resulted from a corporate reorganization. The principle was first suggested in *Trubowitch v. Riverbank Canning Co.* (1947) 30 Cal.2d 335 (*Trubowitch*), in which the plaintiff, an assignee, sought to arbitrate a dispute over nondelivery of fruit under a contract containing a nonassignment clause. After the contract was made, the original party, a corporation, was dissolved, and its assets were distributed to its shareholders, who carried on the business. (*Id.* at pp. 337–338.) The defendant resisted arbitration over its nondelivery because it had not consented to an assignment to the shareholders. (*Id.* at p. 338.) In considering the issue, the court held, "if an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassignability of the contract." (*Id.* at pp. 344–345.) In finding the assignment valid under this principle, *Trubowitch* reasoned the "seller's financial interests were fully protected" because the contract involved only the delivery of goods and contained provisions ensuring payment would be made. (*Id.* at p. 346.) The court distinguished such a contract from one for the provision of "services requiring special skill, capacity or taste." (*Ibid.*)

In the second decision cited by defendants, *People ex rel. Dept. Pub. Wks. v. McNamara Corp. Ltd.* (1972) 28 Cal.App.3d 641 (*McNamara*), the defendant corporation was granted a state construction contract. Following its entry into the contract, the defendant assigned its interest in the contract to its wholly owned subsidiary without obtaining the state's consent. (*Id.* at p. 645.) After performance of the contract was "brought to satisfactory completion" (*ibid.*), the state defended against a claim for payment, in part, by contending the contract was rendered unenforceable as a result of the lack of consent. While the court quoted *Trubowitch* in reaching its conclusion, it ultimately held that the assignment did not render the contract unenforceable because the

21

unconsented assignment was ineffective. Because the parent corporation remained responsible to the state under the contract, the court held, to deny enforcement "would be to exalt form above substance." (*Id.* at p. 649.)

Accordingly, neither *Trubowitch* nor *McNamara* holds that contracts are freely assignable among the wholly owned subsidiaries of a corporate parent, notwithstanding the presence of a nonassignment clause. The holding in *Trubowitch* was actually quite narrow. The contract was merely for the delivery of goods, and there were provisions in the contract to ensure the defendant would receive payment for the goods. (*Trubowitch, supra*, 30 Cal.2d at p. 346.) The court expressly noted that a different result was likely if the contract required, as here, "services requiring special skill, capacity or taste." (*Id.* at p. 346.) *McNamara*, in turn, appears to have based its holding on the ineffective nature of an unconsented assignment. Just as we have held with respect to Facilities, *McNamara* found the defendant, the putative assignor, continued to have an "unaltered duty . . . to perform the contract" notwithstanding the assignment, since, in the absence of state consent, the assignment was ineffective to shift the defendant's obligation to the state to perform. (*McNamara, supra*, 28 Cal.App.3d at p. 649.) Both decisions are therefore consistent with our conclusion that the internal assignment did not relieve Facilities of its status of obligor under the contract.

The essence of defendants' argument is that there was no CSLL violation because Management, following its licensure, began performing day-to-day work under the contract well before the lapse of Facilities' license. Indeed, Facilities was incapable of such work, because the necessary employees and assets had been transferred to Management. The CSLL is not necessarily satisfied merely because the person or entity actually performing services under a contract is licensed. (See, e.g., *Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 940 [unlicensed entity that entered into contract and claimed merely to be the " 'administrator' " of work barred from recovery].) Rather, a license is required for any person who is "engaged in the business or acting in the capacity of a contractor." (§ 7031, subd. (a).) In remaining the responsible party on the contract, Facilities continued to act as a contractor well past the

22

lapse of its license.  Further, while Facilities may not have maintained the employees necessary to perform day-to-day work, it continued in corporate existence and retained officers, thereby permitting it to carry out such administrative duties as securing insurance and bonding, soliciting and accepting payment, and executing contract amendments.  Because these activities were in the capacity of a contractor, Facilities was required to be licensed until execution of the assignment relieved it of that responsibility.

### 4. *Ratification Through the Assignment*

Even if the internal assignment was ineffective in avoiding a forfeiture, defendants argue (1) JCC ratified the internal assignment in executing the assignment and (2) the assignment itself was retroactive or related back to the date of the internal assignment.  It is by no means clear that a violation of the CSLL can be cured after the fact in this manner, but we assume its effectiveness for purpose of argument.

The parties to the assignment are JCC and the three Jacobs entities.  The recitals of the assignment state (1) Jacobs, at some unspecified time, notified JCC that due to a corporate consolidation Facilities would no longer enter into contracts for the type of services provided under the contract and that such services "are" being performed by Management; (2) in furtherance of Jacobs's corporate consolidation, the assignment "is intended to evidence [Facilities'] assignment of the Contract to [Management], and [Management's] assumption of the Contract"; (3) Facilities "desires to memorialize its assignment of the Contract to [Management]"; (4) Management "desires to memorialize its assumption of the Contract"; and (5) Management possesses the qualifications to perform under the contract.  The covenants of the assignment include an assignment of the contract from Facilities to Management,[17] a ratification by Management of "all actions taken by [Facilities] under or with respect to the Contract," a warrant by Management of its suitability, a consent by JCC to the assignment, and a guaranty by

---

[17] This covenant states, Facilities "hereby . . . assigns and transfers the Contract to [Management].  [Management] hereby assumes the Contract from [Facilities], including all of [Facilities'] rights, . . . responsibilities, and liabilities under or flowing from the Contract as if [Management] was the original party to the Contract."

23

Jacobs of Management's performance. The covenant of assignment states Management assumes the contract "as if [Management] was the original party to the Contract." JCC's consent states: "The State hereby executes and enters into this Agreement solely for the purpose of consenting to, and the State hereby consents to, the Assignment and Assumption of the Contract on and subject to the terms and conditions set forth in this Agreement."

Defendants argue the jury could have relied on the assignment as evidence in finding a ratification of the internal assignment. In making this argument, defendants seek to convert what would appear to be an issue of contract interpretation into an issue of fact, thereby invoking the deferential standard of review applicable to appellate review of findings of fact. We might agree with defendants if there were some other evidence to support a finding of ratification. That is not the case. There is no indication the parties even discussed JCC's ratification of the internal assignment. Instead, Facilities' *only* evidence of a ratification is the effect of the assignment. The issue is therefore one of contract interpretation, to which we apply de novo review. (*Pittsburg Unified School Dist. v. S.J. Amoroso Construction Co., Inc.* (2014) 232 Cal.App.4th 808, 826.)

We find little or nothing in the assignment to support a conclusion JCC ratified the internal assignment. Most importantly, there is no express covenant of ratification. If the parties had intended for JCC to ratify the internal assignment, it would have been simple for them to include such a covenant. To the contrary, in the places in the agreement where one might expect confirmation of a ratification by JCC, it is absent. Most obviously, the provision entitled "Ratification" refers only to Management's ratification of actions taken by Facilities under the contract; there is no mention of ratification by JCC of the internal assignment. In addition, the covenant relating to JCC's consent to the assignment, another logical place to insert a provision relating to ratification by JCC, makes no mention of it. That provision states only that JCC consents to the assignment itself, not to any earlier internal assignment.

As discussed above, the assignment contained a series of recitals that referred indirectly to the internal assignment. One of these constituted an acknowledgement by

24

JCC that, at some unspecified date prior to the execution of the assignment, Facilities had notified JCC that Management was actually performing the services being delivered under the contract. Defendants argue from this and the other recitals that the assignment should be interpreted as effecting the internal assignment, which occurred over a year earlier. The language of the covenants suggests otherwise. The language of the assignment covenant states Facilities "hereby . . . assigns and transfers the Contract" and Management "hereby assumes the Contract." Both are phrased in the present tense, implying the transfer of rights and duties occurred by means of the assignment itself, at the time of execution of the assignment. There is no reason to construe this language to ratify or recognize an earlier transfer.

Defendants also argue the language in the assignment covenant stating Management assumes the contract "as if [Management] was the original party to the Contract" is evidence of a ratification. The meaning and legal implications of this phrase are unclear, but there is no reason to construe it as a ratification of the internal assignment, which did not occur until two years after the execution of the contract. If the language were taken literally, it would substitute one CSLL violation for another, since Management did not possess a license until two years after performance of the contract began.[18]

Defendants also argue JCC "relinquished its right to object to the [internal] assignment because a subsequent consent to a prior assignment 'relates back to the time of the assignment,' " quoting *University of Judaism v. Transamerica Ins. Co.* (1976) 61 Cal.App.3d 937, 942 (*Transamerica*). As part of its acquisition of real property, the plaintiff in *Transamerica* was assigned a fire insurance policy covering the property, issued by the defendants. No change in use occurred as a result of the acquisition, since

---

[18] In this connection, defendants cite the long-standing principle that " 'if an agreement can be reasonably interpreted so as to avoid a forfeiture, it is the duty of the court to avoid it.' " (*Universal Sales Corp. v. Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771.) For the reasons discussed above, we do not believe it would be reasonable to construe the assignment as ratifying the internal assignment.

25

the lessee of the property was the same before and after.  One month later, the property burned, and the defendants were not notified of the assignment of their policy until after the fire.  (*Id.* at p. 939.)  They attempted to cancel the policy, citing a clause requiring the insurers' consent to any assignment.  (*Id.* at p. 940.)

In denying cancellation, the court noted the purpose of the nonassignment provision was to prevent an increase of risk of loss due to a change of ownership without the knowledge of the insurer.  (*Transamerica, supra,* 61 Cal.App.3d at p. 940.)  The court explained:  "In this case, had notice been promptly given prior to the loss, defendants would have routinely approved the assignment of the policy to plaintiff. . . . There is no evidence that the change of ownership in any way increased the risk to defendants.  Since the change of ownership did not increase the risk to defendants, and they would have routinely approved the assignment, they cannot claim they suffered any prejudice from the late notice.  [Citation.] [¶] . . . [¶] The language of the provision is consistent with plaintiff's theory that defendants should be deemed to have consented to the assignment, and that such consent relates back to the time of the assignment. . . . To avoid a forfeiture, plaintiff may, in lieu of express approval, show that the assignment would have been routinely approved."  (*Id.* at p. 942, fn. omitted.)  The holding of *Transamerica* is an exception to the general rule of law, which enforces nonassignment clauses in insurance contracts.  (E.g., *Henkel Corp. v. Hartford Accident & Indemnity Co.* (2003) 29 Cal.4th 934, 943–945.)

We conclude *Transamerica*'s finding of deemed approval and relation back must be restricted to the assignment of standard property insurance policies, the situation before the *Transamerica* court.  It seems likely, as the court believed, that property insurers routinely approve the assignment of their policies from the seller to the purchaser of covered property when the underlying use of the property does not change.  In the absence of a change in use, there is unlikely to be a good faith reason to refuse.  Further, if an assignment is approved, the approval necessarily relates back to the date of the sale in order to avoid a lapse in insurance coverage.  There is no basis, however, for applying this rule to the assignment of other, less standardized contracts.  To do so would cause the

26

enforceability of nonassignment clauses to depend upon an after-the-fact evaluation of the likelihood of routine approval of a typical assignment, an entirely impractical standard.

In any event, there was no evidence to suggest JCC would "routinely" consent to the type of assignment sought by Facilities, as required by *Transamerica*. JCC engaged in a formal RFP process in order to find a suitable service provider. Any change in provider, even if due to a corporate reorganization, would require similar due diligence. JCC would necessarily have wanted to satisfy itself the assignment posed no business risk, even if the assignment merely recognized a change in corporate structure. Simply as a matter of fact, JCC delayed when first approached for a novation, and it refused to sign an assent to novation and would not consent to the assignment without a guarantee of performance by Jacobs. There was nothing routine about its consent.[19]

Nor is there any justification for finding that JCC's consent relates back to the time of the internal assignment. As noted above, such consent is necessary in the insurance context to avoid a lapse in coverage. While defendants argue relation back was necessary here to avoid the lapse in licensure, there is no reason to conclude JCC's duty of good faith *required* it to absolve Facilities of its lapse in licensure, in the same way the insurer's duty of good faith required it to maintain coverage. As noted by *Transamerica*, the insurers accepted premium payments made after the assignment; providing coverage was simply delivering the services for which they had already accepted compensation. There is no parallel circumstance here.[20]

---

[19] Defendants argue JCC and Facilities "routinely" entered into written contracts "long after they had modified their contractual relationship." While this may be true, it does not mean that the alteration itself was routinely approved. In any event, there is no evidence the "contractual relationship" between JCC and Facilities was "modified" by the substitution of Management prior to execution of the assignment. Any earlier substitution was a unilateral action by the Jacobs entities.

[20] Defendants also argue JCC "led Jacobs to believe it would not object to [Management's] assumption" of the contract when a novation was first proposed in 2008. While that may be true, JCC never suggested to the Jacobs entities that the approval, when it occurred, would be deemed retroactive. There is no basis for estoppel.

27

Defendants once again raise *Trubowitch* and *McNamara* in this context, arguing, in effect, that even if the internal assignment was not effective at the time it was entered into, given JCC's right of consent, we should view JCC's eventual consent as retroactive because the assignment was the result of a mere corporate reorganization and, as the jury found, did not harm JCC's interests. (*Trubowitch, supra,* 30 Cal.2d at pp. 345–346.) At this point, we run into the abolished doctrine of substantial compliance. As discussed above, JCC's interest in the prospective performance of the contract was sufficient to preclude its free assignment among wholly owned subsidiaries of Jacobs. JCC had the contractual right to approve such a change, even if it was merely the result of a corporate reorganization. To find that the assignment had a retroactive effect merely because Facilities' breach of the assignment clause did not harm JCC, when the ordinary principles of law discussed above provide no grounds for finding the assignment to be effective prior to its effective date, would be to invoke a special rule excusing a section 7031 remedy because a violation of the CSLL was harmless. This is just the type of rule-bending precluded by the Legislature when it abolished the substantial compliance doctrine.

Defendants also argue JCC waived its right to object to the internal assignment by dealing with Management at a time when it had knowledge of the assignment, citing *Trubowitch*. (*Trubowitch, supra*, 30 Cal.2d at p. 342.) Assuming the applicability of the principle in this context, the record does not support a finding that the Jacobs entities informed JCC of the internal assignment prior to execution of the assignment. The initial notification, in April 2008, merely informed JCC that Jacobs intended to execute a novation transferring the contract from Facilities to another subsidiary at some point in the future. Thereafter, Jacobs sent proposals to JCC seeking its consent to a novation, and it continued to send invoices and execute contractual documents in the name of Facilities. There is no evidence Jacobs informed JCC it had unilaterally assigned the contract to Management, and Jacobs's continued attempts to negotiate a formal assignment of the contract suggested otherwise.

28

Defendants additionally contend the internal assignment was not void but voidable, citing *People v. Klopstock* (1944) 24 Cal.2d 897 (*Klopstock*), and argue JCC effectively affirmed the internal assignment when it entered into the assignment. In *Klopstock,* a party's claim of right in property derived from the assignment of a lease, which had occurred without the consent of the lessor. After the lessor learned of the assignment, it objected but "served no notice terminating or declaring a forfeiture of the lease." (*Id.* at p. 899.) The court held that the lessor's objection to the assignment, in the absence of a formal declaration of forfeiture, was ineffective to prevent the vesting of property rights in the assignee. As the court explained, the assignments of the lease "though made without the written consent of the lessor, were merely *voidable*, not void; there was no ipso facto termination of the lease by reason of the lessee's failure to obtain the lessor's written consent to assignment." (*Id.* at p. 901.) Because the lessor did not "take advantage of the exclusive remedy available to it for termination of the lease" by "declaration of a forfeiture upon proper notice," the court held, the lessor did not prevent the passing of property rights through assignment. (*Id.* at p. 902, italics omitted.)

As the foregoing account suggests, the principle announced by *Klopstock* is unique to lease law: the unconsented assignment of a lease can be voided by the lessor's declaration of forfeiture, but it is valid unless and until such a declaration has been made. (*Klopstock, supra*, 24 Cal.2d at pp. 901–902.) *Klopstock* does not purport to make this principle applicable outside lease law, in which there are no comparable procedural requirements for the rejection of an assignment, and subsequent decisions have applied the decision solely within that framework. (E.g., *Guerin v. Blair* (1949) 33 Cal.2d 744, 746–747; *Weisman v. Clark* (1965) 232 Cal.App.2d 764, 767.) With respect to an ordinary contract containing a nonassignment clause, an unconsented assignment, rather than effective until voided, is simply ineffective. Taking the present situation as an example, it is inconsistent with contract law to claim, following the internal assignment, that JCC was required to accept performance from Management unless or until it voided the contract. On the contrary, JCC had the right to insist on performance by Facilities until or unless it had consented to the assignment. To hold otherwise would, in

29

effect, permit Jacobs to force JCC to accept the internal assignment or forfeit the contract, a choice inconsistent with JCC's contractual right to approve any assignment. Accordingly, JCC's act in entering into the assignment did not affirm the earlier internal assignment; rather, it effected an assignment as of the effective date of the assignment.[21]

### 5. *Conclusion*

We view the jury's verdict as an attempt to reach an equitable resolution, given the harsh consequences to defendants from the strict application of section 7031. The Jacobs entities' violation of the statute, clear as it is, appears to have resulted from the manner of execution of their corporate reorganization, rather than any attempt to evade licensure requirements. But though the jury was unwilling to give its imprimatur to the forfeiture of income, that is the remedy the Legislature has prescribed, and our task is to implement the Legislature's prescription. Accordingly, we reverse the judgment.

## B. *Substantial Compliance*

Defendants request that, in the event the judgment is reversed, the matter be remanded for the conduct of a substantial compliance hearing. We find such a remand appropriate.

### 1. *Waiver of Hearing*

As discussed above, section 7031, subdivision (e) codifies the substantial compliance defense to enforcement of the forfeiture remedy.[22] Defendants asserted a

---

[21] As a final matter, defendants' counsel contended for the first time at oral argument that Management was entitled to recover the unpaid sums awarded by the jury even if Facilities was not, because the sums accrued at a time when Management, a licensed entity, was performing the services under the contract. The issue was waived when defendants failed to raise it in their respondents' brief. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) In any event, Management lacks standing to recover under the contract because it was not a party to the contract during the time when the unpaid bills accrued. (*Bleavins v. Demarest* (2011) 196 Cal.App.4th 1533, 1542–1543.) While defendants asserted a claim for unjust enrichment in the counterclaim, it is well-established that equitable theories cannot be employed to overcome a failure of licensure. (*Ahdout, supra,* 213 Cal.App.4th 21, 31.)

[22] Section 7031, subdivision (e) provides, in relevant part: "[T]he court may determine that there has been substantial compliance with licensure requirements under

30

substantial compliance defense in their answer to the complaint and requested a substantial compliance hearing when the parties appeared for trial. The court granted the request "with the understanding that the hearing would take place after the case went to the jury and that the type [*sic*] would rely on trade testimony as the evidentiary hearing that's required by statute and that counsel could offer more evidence especially for that hearing if they needed or wanted to do so." Counsel clarified with the court that the hearing would occur "at the conclusion of the trial," which the court confirmed. Defendants never thereafter requested a substantial compliance hearing, either at the close of evidence or after judgment.

JCC contends defendants forfeited such a hearing when they failed to request it after submission of the case to the jury and before the jury returned with its verdict. We do not understand the trial court's ruling to have anticipated that the hearing would occur immediately after the matter was sent to the jury. On the contrary, because there would be no way of knowing how long the jury's deliberations would require, it would make no sense to hold a hearing immediately after submission. Rather, we interpret the court as deferring the substantial compliance hearing until after trial, as defendants' counsel suggested.

Further, we find no forfeiture. Defendants timely requested a substantial compliance hearing. The trial court granted the request but deferred the hearing until after the jury rendered its verdict. Once the defense judgment was entered, a substantial compliance hearing became superfluous. Defendants should not be deprived of their right to prove compliance with section 7031, subdivision (e) merely because the trial court chose to defer the matter and they prevailed at trial. (See *Pacific Caisson &*

this section if it is shown at an evidentiary hearing that the person who engaged in the business or acted in the capacity of a contractor (1) had been duly licensed as a contractor in this state prior to the performance of the act or contract, (2) acted reasonably and in good faith to maintain proper licensure, (3) did not know or reasonably should not have known that he or she was not duly licensed when performance of the act or contract commenced, and (4) acted promptly and in good faith to reinstate his or her license upon learning it was invalid."

31

*Shoring, Inc. v. Bernards Bros. Inc., supra,* 198 Cal.App.4th 681, 693–696 [where court failed to address issue of substantial compliance in granting summary judgment, contractor was entitled to remand for a trial on the issue].)  The sole case cited by JCC in support, *Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, is wholly inapposite.

We also decline JCC's invitation to find as a matter of law that the Jacobs entities failed to comply with section 7031, subdivision (e).  To demonstrate substantial compliance, a contractor must show it was licensed prior to performing, acted reasonably and in good faith to maintain its license, was unaware of any failure of licensure upon commencement of performance, and acted promptly and in good faith to reinstate its license upon learning it was invalid.  (*Ibid.*)  As the trial court anticipated in its ruling, this demonstration may require the presentation of evidence on matters that were not directly relevant to the issues before the jury.  Defendants are entitled to a full evidentiary hearing on the issues relevant to the elements of substantial compliance under subdivision (e).

**2.** *Nature of Hearing on Remand*

In ruling that defendants have not waived their right to a substantial evidence hearing, we have assumed that section 7031, subdivision (e) requires resolution of the issue by a judge, rather than jury.  That appears to have been defendants' assumption in seeking such a hearing from the trial court.  Rather than rely on an unexamined assumption, however, we asked the parties for supplemental briefing regarding the nature of the hearing to be conducted on remand.[23]  Reviewing the issue de novo (*Hopkins v.*

_____

[23] In their supplemental briefing, the parties expressed concern that this issue is being raised for the first time on appeal.  As suggested, the issue is potentially pertinent to JCC's claim of waiver; if defendants had a right to jury trial on the issue of substantial compliance but failed to submit the issue to the jury, it was arguably waived.  In any event, the issue is one of law and has been fully briefed by the parties.  In aid of the trial court on remand, appellate courts may address legal issues that necessarily will arise later in the proceeding.  (E.g., *Kurtin v. Elieff* (2013) 215 Cal.App.4th 455, 482; *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1502, disapproved on other grounds in *People v. Freeman* (2010) 47 Cal.4th 993, 1006, fn. 4; see Code Civ. Proc., § 43.)

32

*Kedzierski* (2014) 225 Cal.App.4th 736, 744), we conclude our assumption was correct.[24] On remand, the substantial evidence hearing must be conducted by the court.

Section 7031, subdivision (e) states that "the court may determine that there has been substantial compliance with licensure requirements under this section if it is shown at an evidentiary hearing" that the contractor satisfied the statutory requirements. Based on this language, there is little room for doubt that the Legislature intended the determination of substantial compliance to be made by a judge, rather than a jury. The language of the Legislature's instruction, that "the court" make the determination after an "evidentiary hearing," is ordinarily used to indicate resolution by a judge. (*Mendoza v. Ruesga* (2008) 169 Cal.App.4th 270, 285; e.g., Evid. Code, § 402 [preliminary determinations of evidence admissibility to be made by "court" out of the presence of jury]; Code Civ. Proc., §§ 116.520, 116.610 ["court" to hear matters in small claims court].) Reflecting trial courts' similar understanding of this language, the statutory substantial compliance determinations reviewed in reported appellate decisions have been made by judges, rather than juries. (E.g., *Oceguera v. Cohen* (2009) 172 Cal.App.4th 783, 788–789; *Construction Financial v. Perlite Plastering Co.* (1997) 53 Cal.App.4th 170, 174.)

This conclusion is reinforced by the equitable nature of the substantial compliance doctrine. Equitable matters are traditionally reserved for resolution by the court. (See generally *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 155–156 (*Hoopes*).) Substantial compliance, a doctrine established long before its adoption in the context of the CSLL, is considered to arise in equity. (See, e.g., *Knapp Development & Design v. Pal-Mal Properties, Ltd.* (1985) 173 Cal.App.3d 423, 436 [referring to "equitable considerations" in connection with § 7031 substantial compliance]; *Roth v. Morton's Chef Services, Inc.* (1985) 173 Cal.App.3d 380, 387 [substantial compliance is an "equitable defense" in a

---

[24] In its supplemental letter brief, JCC asks us to also address whether (1) the issue of substantial compliance is subject to summary adjudication and (2) a trial court may decline to exercise its discretion to find substantial compliance, despite finding the statutory elements to be satisfied. We decline to do so.

33

wrongful detainer action]; *Hill v. Newkirk* (1994) 26 Cal.App.4th 1047, 1059 [labeling substantial compliance an "equitable doctrine" as a defense to failure to comply with California Tort Claims Act]; *Knight v. Black* (1912) 19 Cal.App. 518, 525–526 [substantial compliance, asserted to avoid forfeiture of a lease, "appeals to the equity side of the court"].)  Given the equitable nature of the substantial compliance doctrine, it is unsurprising that the Legislature would assign its determination to the court, rather than a jury.[25]

Defendants contend that, regardless of the Legislature's intent, they have a constitutional right to the jury determination of substantial compliance.  "[T]he state constitutional right to a jury trial 'is the right as it existed at common law in 1850, when the Constitution was first adopted . . . .' [Citations.] [¶] 'As a general proposition, "[T]he jury trial is a matter of right in a civil action at law, but not in equity." [Citations.]' [Citation.]  '[I]f the action is essentially one in equity and the relief sought "depends upon the application of equitable doctrines," the parties are not entitled to a jury trial.' [Citation.]  And 'if a proceeding otherwise identifiable in some sense as a "civil action at law" did not entail a right to jury trial under the common law of 1850, then the modern California counterpart of that proceeding will not entail a *constitutional* right to trial by jury.' " (*Franchise Tax Bd. v. Superior Court* (2011) 51 Cal.4th 1006, 1010.)

Defendants' counterclaim for payments withheld under the contract was asserted under section 7031, but it was premised on the contract.  We therefore assume for purposes of argument that it was legal in nature.  Although disgorgement is ordinarily viewed as an equitable remedy (*Cruz v. PacifiCare Health Systems, Inc.* (2003)

---

[25] Defendants contend that when interpreted to require court determination, section 7031 conflicts with Code of Civil Procedure section 592, which states that issues of fact arising in the context of breach of contract actions are to be tried by a jury. Section 592 has generally been interpreted as codifying the common law distinction between law and equity and "does not expand the jury trial right beyond its common law scope." (*Crouchman v. Superior Court* (1988) 45 Cal.3d 1167, 1174.)  For that reason, we do not view the issue of the availability of a jury under section 592 as different from the issue of its availability under the state Constitution, discussed below.

30 Cal.4th 303, 307, 317–318), when, as here, "liability is definite and damages may be calculated without an accounting, the action is legal," even though the relief is in the nature of disgorgement.  (*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1483.)  JCC's cause of action is therefore likely legal, as well.

That is not the end of the issue.  As *Hoopes* noted, "Complications arise when legal and equitable issues (causes of action, requested remedies, or defenses) are asserted in a single lawsuit."  (*Hoopes, supra,* 168 Cal.App.4th at p. 156.)  In that situation, "The lawsuit is rarely treated as a single unit for purposes of determining the right to a jury trial.  [Citations.]  In most instances, separate equitable and legal issues are 'kept distinct and separate,' with legal issues triable by a jury and equitable issues triable by the court."  (*Ibid.*)

When equitable defenses are interposed to a legal cause of action, the "proper rule" is for the court to hear and dispose of the equitable defenses first, before submitting the legal claim to a jury.  (*Swasey v. Adair* (1891) 88 Cal. 179, 180 (*Swasey*); *Hoopes, supra*, 168 Cal.App.4th at p. 157 ["better practice" is for the court to decide equitable issues first]; *Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 763.)  Alternatively, the court may try all issues in one proceeding, with the jury sitting in an advisory role with respect to factual issues applicable to the equitable issue.  (*A-C Co. v. Security Pacific Nat. Bank* (1985) 173 Cal.App.3d 462, 473; but see *Swasey*, at p. 181 [equitable defense that could be asserted in independent suit against the plaintiff must be heard first].)  In that circumstance, it remains "the duty of the trial court to make its own independent findings . . . . [Citation.]  There is no authority for asking a jury's advice as to 'whether injustice can only be avoided by enforcing the promise' or, more generally, whether the equitable doctrines of promissory estoppel or unclean hands should be applied."  (*A-C Co.*, at p. 474.)  Whichever approach is adopted, equitable issues retain their character, despite being raised in the context of a legal claim.  A litigant has no constitutional right to a jury determination of an equitable issue merely because it is raised in the context of a claim at law.

35

Defendants argue the substantial compliance doctrine should be viewed as arising at law in these circumstances because the doctrine "goes to [Management's] capacity to recover under the contract." In making their argument, defendants equate "capacity to recover" with "capacity to contract" and argue the latter is an element of their cause of action at law for breach of contract. Contrary to defendants' premise, however, capacity to contract and capacity to recover are quite different concepts. Capacity to contract refers to a party's power to enter into a binding contract, and it ordinarily depends upon an individual's age and mental soundness. (Rest.2d Contracts, § 12, p. 30; Civ. Code, §§ 38, 39, 1556, 1557.) Defendants suggest no reason why a contractor lacking a license is legally unable to contract. While, as a result of section 7031, the contractor cannot use the courts to enforce payment if performance of its contract requires a license, the contract itself is not void or voidable for lack of capacity. The argument therefore provides no basis for concluding substantial compliance is a legal doctrine as asserted in Management's counterclaim.

Compliance with the CSLL can fairly be characterized as an element of defendants' cause of action for breach (§ 7031, subd. (a)), but that alone does not make substantial compliance a legal doctrine. Rather, in that context, substantial compliance is an equitable doctrine asserted by defendants to permit recovery in spite of their inability to prove CSLL compliance, in much the same way the doctrine can be asserted to excuse a failure to comply with the Tort Claims Act. (See *Hill v. Newkirk, supra,* 26 Cal.App.4th at p. 1059.) Alternatively, as asserted by defendants in response to JCC's claim for disgorgement, substantial compliance is an equitable defense to JCC's claim. Either way, the doctrine is equitable in nature. Accordingly, defendants have no constitutional right to its determination by a jury.[26]

---

[26] As defendants note, it has been held that courts have the discretion to submit an equitable defense to the jury when the defense " 'is so intertwined with legal claims that it cannot be separately tried to the judge.' " (*Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 623.) There is reason to doubt whether that discretion allows the submission of the issue of substantial compliance to a jury, since the Legislature has expressly instructed otherwise.

36

**C. *Attorney Fees***

The Jacobs entities are not entitled to attorney fees because they are no longer the prevailing party, but we would have reversed the award anyway as unauthorized by the contractual provisions relied upon by defendants. We review the legal basis for the attorney fee award de novo. (*California Wholesale Material Supply, Inc. v. Norm Wilson & Sons, Inc.* (2002) 96 Cal.App.4th 598, 604.)

There is no prevailing party attorney fees clause in any of the parties' contractual documents. Defendants sought attorney fees under a standard indemnity clause in the contract, under which Facilities agreed to indemnify JCC against claims arising from, among other things, Facilities' breach of the contract or its violation of law. The clause included attorney fees as one of the costs that Facilities agreed to indemnify.[27] Although the indemnity clause imposed a duty only on Facilities, defendants argued it should be found to impose a mutual attorney fees obligation under Civil Code section 1717, subdivision (a).

In addition, defendants sought attorney fees under the guaranty executed by Jacobs at the time of the assignment, which provided that Jacobs guaranteed the payment of "obligations" by Facilities and Management. The term "obligations" was defined to include "any and all costs and expenses, including attorney fees and costs, incurred by [JCC] in enforcing the Contract or this Parent Guaranty . . . ." Again, defendants argued the reference to attorney fees imposed a mutual obligation.

The indemnity provision in the contract is an ordinary indemnity clause. The general rule is "the inclusion of attorney fees as an item of loss in a third party claim-indemnity provision does not constitute a provision for the award of attorney fees in an action on the contract" because " 'an indemnity clause . . . generally obligates the

---

[27] The clause states: "Contractor agrees . . . to indemnify, defend . . . and hold harmless . . . [JCC] . . . and any and all of their . . . employees . . . from any and all claims, lawsuits, losses, costs (including attorney fees and costs), liabilities, and damages arising from, related to or in connection with . . . [¶] . . . Contractor's . . . negligent acts or omissions, . . . [or] [¶] . . . Contractor's breach of its obligations under this Agreement."

indemnitor to reimburse the indemnitee for any damages the indemnitee becomes obligated to pay third persons.' " (*Carr Business Enterprises, Inc. v. City of Chowchilla* (2008) 166 Cal.App.4th 14, 20 [denying direct action attorney fees under a standard indemnity clause].)  To find a right to attorney fees in a direct action under an ordinary indemnity clause, such as the clause in the contract, would invest every agreement containing an indemnity clause with an attorney fees clause, even if, as occurred here, the parties omitted such a clause.  This is particularly inappropriate because Civil Code section 1717, which governs the award of contractual attorney fees, applies only when the contract "*specifically* provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party." (*Id.*, subd. (a), italics added.)  The indemnity clause in the contract does not "specifically" refer either to actions to enforce the contract or to the prevailing party.

Defendants cite two decisions in which attorney fees were awarded in direct actions under indemnity clauses, *Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010 and *Wilshire-Doheny Associates, Ltd. v. Shapiro* (2000) 83 Cal.App.4th 1380.  Both decisions recognized that indemnity clauses generally cover only third party claims, but they also held each clause must be interpreted individually to determine whether direct actions were intended to be included as well. (*Zalkind*, at pp. 1023–1024; *Wilshire-Doheny*, at p. 1396.)  In both decisions, the court described at length the unique contractual terms indicating an intent to permit recovery in the particular direct action at issue. (*Zalkind*, at pp. 1027–1029; *Wilshire-Doheny*, at p. 1397.)  There is no similar language here.  The contract's indemnity clause is a garden variety clause that must be interpreted according to the ordinary rule.

Similarly, the guaranty contained no clause "specifically provid[ing] that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party." (Civ. Code, § 1717, subd. (a).)  The guaranty merely provided that Jacobs would pay any obligation incurred by the other Jacobs entities under the contract.  There is no reason to believe the guaranty, the purpose of which was merely to ensure the payment of any debts to JCC of the other two Jacobs

entities, was intended to expand their obligations under the contract by creating a right to attorney fees not otherwise available under the contract—in other words, to permit an award of attorney fees under circumstances in which the contract itself did not permit such an award. On the contrary, the guaranty specifically provided that Jacobs's liability under the guaranty was not to be greater or less than Facilities' and Management's liability under the contract. We decline to construe the guaranty to create an independent right to attorney fees beyond the rights created by the contract.

## III. DISPOSITION

The judgment of the trial court is reversed. The matter is remanded to the trial court for an evidentiary hearing on substantial compliance pursuant to section 7031, subdivision (e). If the Jacobs entities are successful in demonstrating statutory substantial compliance, the trial court shall reinstate the judgment. If defendants are unsuccessful, the trial court shall enter judgment against defendants in the amount of $18,331,911, plus taxable costs and interest, if appropriate. Unless the prevailing party can demonstrate a valid basis for an award of attorney fees other than those already asserted by the Jacobs entities, it shall not be awarded attorney fees. JCC shall recover its costs on appeal.

_____
Margulies, Acting P.J.

We concur:

_____
Dondero, J.

_____
Jones, J.[*]

_____
[*] Presiding Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:   San Francisco County Superior Court

Trial Judge:   Hon. Wallace P. Douglass

Counsel:

Reed Smith, Paul D. Fogel and Dennis Peter Maio; Sedgwick, Marilyn Klinger and Jonathan T. Rodriguez for Plaintiff, Cross-defendant and Appellant.

Gibson, Dunn & Crutcher, Daniel M. Kolkey, Theane Evangelis, Kimberly A. Nortman and Alexander M. Fenner; Keesal, Young & Logan, Samuel A. Keesal, Jr., Albert E. Peacock, III, and David A. Tong for Defendants, Cross-complainant and Respondents.